**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ X

UNITED STATES OF AMERICA, THE STATE OF NEW :     No. 09 CV 1800
YORK, *ex. rel.* ASSOCIATES AGAINST OUTLIER : 
FRAUD, :

                Plaintiffs, :

    v. :     **IN CAMERA**
                                           :     **AND UNDER SEAL**

HURON CONSULTING GROUP, INC., SPELTZ AND : 
WEIS, KPMG, HEALTHCARE MANAGEMENT :     **FIRST AMENDED**
SOLUTIONS, LLC and EMPIRE HEALTHCHOICE :     **COMPLAINT**
ASSURANCE, INC. (D/B/A EMPIRE MEDICARE : 
SERVICES), :

                Defendants. :     **JURY TRIAL DEMANDED**

------------------------------------------------------------------ X

COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §
3279 *ET SEQ.* AND THE NEW YORK FALSE CLAIMS ACT, N.Y. STAT. FIN § 187, *ET
SEQ.*

Pursuant to the aforementioned statutes and codes, the United States of America, and the State of New York, *ex rel* Associates Against Outlier Fraud (collectively the "Plaintiff" or "Relator"), by and through their undersigned attorneys, for their Complaint, allege as follows:

## I.    NATURE OF ACTION

1.      This Amended Complaint, filed under seal, asserts claims under the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729-33, ("FCA" or "False Claims Act"), based upon violations of the Act, and inclusive of analogous laws of the State of New York ("NYS"), being false claims and statements submitted to the United States and NYS from approximately 2005 to 2007. [1] All charges brought herein against the Defendants are based upon Defendant's false claims and statements made or caused in connection with the submission of Medicare and/or Medicaid reimbursement forms seeking outlier reimbursement from at least January 1, 2004 and continuing thereafter until at least 2007.

2.      The false claims herein alleged are further based, *inter alia*, on express or implied certifications by Defendants that there was compliance with applicable Federal law and local laws.  Violations of these laws give rise to causes of action under the False Claims Act and the non-Federal false claims laws cited herein.

3.      (a)      Under the Act, a defendant is liable to the United States if the defendant (1) knowingly (2) presents or *causes to be presented* (3) to an officer or employee of the United States Government (4) a false or fraudulent claim for payment or approval.  *See* 31 U.S.C. §3729(a)(l).  A defendant may also be liable for (1) knowingly (2) making or causing to be made (3) a false record or statement (4) to obtain payment of a false or fraudulent claim.  *See* 31 U.S.C. §3729(a)(2).  For purposes of the Act, "know" or "knowingly" means that the defendant

---

[1] For simplicity, all references herein to the Federal False Claims Act are also references to the FCA of the State of New York.

had actual knowledge of the falsity of the information, acted in deliberate ignorance of its truth or falsity or acted in reckless disregard of the truth or falsity of the information

(b)     The United States has the burden of proving a violation of the Act, or proving, causing and/or aiding and abetting a violation or conspiring to commit a violation of the Act, by a preponderance of the evidence. *See* 31 U.S.C. §3731(c).

(c)     The Act does not permit a person: (i) to remain silent after discovering that an error that, if uncorrected, would result in the receipt or retention of improper payments; or (ii) to take steps designed to hide the occurrence of an error so that excess payments will be made or retained.  42 U.S.C.§1320a-7b(a)(3), captioned "Making or causing to be made false statements or representations," making both a felony:

> Whoever--
>
> (3) having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment, or (B) the initial or continued right to any such benefit or payment of any other individual in whose behalf he has applied for or is receiving such benefit or payment, conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized...
>
> shall (i) in the case of such a statement, representation, concealment, failure, or conversion by any other person in connection with the furnishing (by that person) of items or services for which payment is or may be made under the program, be guilty of a felony...

(d)     Under 31 U.S.C.§3729(a), anyone aiding and abetting or conspiring to obtain overpayments from the Government or who remains silent about a known overcharge, such as an outlier reimbursement, causes a false claim to be presented to the Government.

## II.   JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3729, 3732(b), *et seq.* and 28 U.S.C. § 1331 and 1345, and has supplemental jurisdiction under the state law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).

5.      Venue is appropriate pursuant to 31 U.S.C. § 3732, 3732(b) and 28 U.S.C. § 1391(b) and (c) in that certain of the claims herein arose, and certain of the acts of Defendants which are the subject of this action occurred, within this District. In addition, Defendants reside in and/or transact business in this District.

## III.   FALSE CLAIMS ACT AND SUMMARY OF COMPLAINT

6.      The False Claims Act was originally enacted during the Civil War, and was substantially amended in 1986. Congress amended the Act to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

7.      The FCA provides that any "person," including a corporation such as some of the Defendants, who knowingly or recklessly submits, or causes the submission of, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $11,000 ($12,000 under the New York FCA) for each such claim, plus three times the amount of the damages sustained by the Government. Liability attaches when a defendant

knowingly seeks payment, or causes others to seek payment, from the Government that is unwarranted.

8.     The FCA allows any "person", including the Plaintiff herein, Associates Against Outlier Fraud, which has information about a false or fraudulent claim against the Government to bring an action for itself, and the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) both to allow the Government time to conduct its own investigation and to determine whether to join the suit and to protect a defendant from publication of spurious charges.

9.     A summary of the Complaint is as follows. This action concerns a continuing pattern and practice of submitting false claims and statements to Medicare and Medicaid in order to obtain illicit outlier reimbursement.

(a)     A failing St. Vincent Catholic Medical Center hospital system turned for assistance, guidance and overall direction to outside consultants, presumably expert in the practice of turning-around failing enterprises. These experts, however, motivated by their own greed and corrupt practices, took over control of the St. Vincent Catholic Medical Center, and through deceit and corrupt practices, charged the hospital exorbitant fees, ran the hospital system into the ground while advising it that all was well, and turned to Medicare and Medicaid as the consultants' piggy bank to generate the unwarranted fees that these outsiders did everything in their powers to keep for themselves and continue to flow, including resort to causing the hospital system falsely to bill and collect from Medicare and Medicaid fraudulent outlier reimbursement of tens of millions of dollars in the period 2005 to 2007. (Some of these outside consultants were terminated by the hospital in 2007.)

(b)     False Claims Acts violations of the outlier reimbursement provisions of Medicare and Medicaid law were committed by the Defendants, by *causing* false claims, statements and fraudulent receipts and by their failure to refund unwarranted outlier reimbursements paid to St. Vincent Catholic Medical Center and its member hospitals, St. Vincent Hospital of Manhattan, Mary Immaculate and St. John's Hospitals of Queens, St. Mary's Hospital of Brooklyn and St. Vincent Hospital of Staten Island/ Sisters of Charity. This causing of false claims and receipts was by the Defendants, (1) Huron Consulting Group, Inc. ("Huron"), (2) Speltz and Weis, (3) David Speltz, (4) Timothy Weis, (5) KPMG, (6) Healthcare Management Solutions, LLC, ("HMS") and (7) Empire Healthchoice Assurance, Inc. (dba Empire Medicare Service) ("Empire") (altogether "Defendants").

(c)     In addition to their standard payment systems, Medicare and Medicaid provide supplemental reimbursement, called "outlier payments," to hospitals and other health care providers in cases where the cost of care is unusually high.   Congress enacted the supplemental outlier payments system to ensure that hospitals possess the incentive to treat inpatients whose care requires unusually high costs.  Outlier payments, but only for cases that qualify under stringent rules, are added to the Diagnosis Related Group ("DRG") adjusted base payment rates set for Medicare and Medicaid for specific diagnoses, plus any applicable adjustments for disproportionate share, indirect medical education and new technologies. However, the consulting company Defendants (Huron, Speltz and Weis and HMS) aided and abetted by, and in conspiracy with the accounting firm Defendant (KPMG), and facilitated by the reckless conduct of the Medicare fiscal intermediary Defendant (Empire), which, notwithstanding that CMS had instituted a new set of outlier rules in 2003, fraudulently continued to apply pre-2003 outlier rules from 2005 to at least 2007, together committed outlier

fraud. The new outlier rule was promulgated because CMS had determined that some hospitals had been fraudulently maximizing outlier payments by fraudulently raising their charges at a much faster rate than their costs were increasing, and it specifically directed government agents such as Empire to follow detailed steps to curb the fraud. This Empire failed to do.

(d)     As a result of the fraud perpetrated by Defendants, Medicare and Medicaid paid tens of millions of dollars in false outlier claims to the chain of hospitals ("Hospitals") within the St. Vincent Catholic Medical Center.

## IV.     THE PARTIES

### The Plaintiff

10.     The Plaintiff is Associates Against Outlier Fraud, a Delaware general partnership which, pursuant to Section 15-201(a) of the Delaware Revised Uniform Partnership Act, is not an entity distinct from its partners.

### The Hospitals

11.     (a)     While not a party, the hospital system focused on herein is integral to the Amended Complaint. St. Vincent Catholic Medical Center ("St. Vincent") has been one of the New York metropolitan area's most comprehensive health care systems, serving 600,000 people annually, established in 2000 as a merger of the Catholic Medical Centers of Brooklyn and Queens, St. Vincent's Hospital and Medical Center of New York and Sisters of Charity Healthcare in Staten Island. The system included five major hospitals, four skilled nursing facilities, a system-wide home care service, a hospice and over 20 ambulatory care sites. At one time, it employed approximately 12,500 full and part-time employees. It was the largest private provider of EMS services in the New York City Fire Department's 9-1-1 service in 2003. In July, 2005, it filed a petition in bankruptcy, and emerged therefrom in 2007.

(b)     In June, 2006, Saint Vincent, acting through the United States Bankruptcy Court for the Southern District of New York, approved the sale of St. John's Hospital of Queens (227 beds) and Mary Immaculate Hospital of Queens (221 beds) to Wyckoff Heights Medical Center's affiliate, Caritas Health Care Planning, Inc. In addition, on January 1, 2007, St. Vincent sold its Staten Island Hospital/Sisters of Charity (440 beds) to Bayonne Medical Center, a New Jersey hospital, and formed a corporation called Bridge Healthcare System. Until it was closed in October 2005, St. Mary's of Brooklyn was a recipient of the fraudulent outlier reimbursement.

### The Defendants

#### The Consultants

12.     (a)     In terms of the creation and implementation of the outlier fraud, the Defendant Huron Consulting Group, Inc. ("Huron"), 1120 Avenue of the Americas, 8th Floor, New York, New York 10036 and Speltz and Weis (and its principals, David Speltz and Timothy Weis) shared the responsibility for the creation of and participation in the outlier scheme. They were the main beneficiaries of the false outlier payments to the Hospitals, as outlier funds became the source of funds that paid their consulting fees.

(b)     Huron provided senior leadership to most administrative departments leading up to and during the supposed restructuring of the St. Vincent system, to the extent that Tamra Aloi, its Interim VP of Reimbursement, commuted weekly from its Chicago office at high expense. The consultants Speltz and Weis, operated by C.E.O. David Speltz and C.F.O. Timothy Weis, were the consultants to the Hospitals starting in early 2004 and, as such, instituted the outlier scheme. After eighteen months of the Speltz and Weis involvement with the Hospitals, at the suggestion of outside counsel to St. Vincent, it was partnered with a second set of consultants, Huron. Together they ran – really controlled – the Hospitals, including the

hospital's reimbursement submissions and activities. Moreover, these two consultant firms maintained, in secrecy, a severe conflict of interest with regard to their supposed client, St. Vincent.

(c)     To run the Hospitals, Huron and Speltz and Weis entered a minimum of 40 *per diem* employees in high positions in finance and operations, reimbursement, billing and overall management. Huron and Speltz and Weis undoubtedly had knowledge of the ongoing outlier scheme, authorized the routine submissions of false outlier claims to Medicare and Medicaid and arranged to become the recipients of the looted Government funds. Thereafter, the Defendant-consultants, facilitated by the Hospitals' accountant-auditor, KPMG, authorized the preparation of a second set of books that memorialized (but hid) the size of their outlier fraud. Moreover, as the turn-around firms for St. Vincent, they claimed credit for what they falsely called a successful turn-around assignment relying, in part, upon the Hospitals' outlier payments they knew had been fraudulently received.

(d)     Huron, a Delaware corporation with its principal place of business in Chicago, Illinois is, according to its S.E.C. Form 10-K for 2007 (filed on February 21, 2008), an "independent provider of financial and operational consulting services. Our highly experienced [1,281] professionals, many of whom have master's degrees in business administration, have doctorates in economics, are certified public accountants, or are accredited valuation specialists and forensic accountants, employ their expertise in accounting, finance, economics and operations to provide our clients with specialized analyses and customized advice and solutions that are tailored to address each client's particular challenges and opportunities." Huron was formed in 2002 and completed its first public offering and became a publicly traded company in October 2004 on the NASDAQ Stock Market. In 2005, while Huron and Speltz and Weis

("S&W") were supposedly working as independent and loyal consultants to St. Vincent, Huron secretly acquired S&W, paying that firm $14 million up front, with more to come later, all dependent upon retaining the St. Vincent consulting assignment which rewarded S&W richly. S&W was renamed Wellspring Management Services, and was touted as being, like Huron, a specialized consulting firm that provided interim management and crisis management services to healthcare facilities. Through its Wellspring affiliate, wrote Huron in its S.E.C. filing, it "helps hospitals . . .improve their financial, operational and market performance through organizational renewal . . to provide full-service offerings to distressed hospitals and other healthcare facilities." Huron boasted about having 163 managing directors "who have revenue-generating responsibilities," including turn-around operations for distressed hospitals, such as the St. Vincent's Catholic Medical System. As part of its business mantra, Huron contended that it recognized that pressures to reduce healthcare spending on publicly funded programs, *e.g.*, Medicare and Medicaid, have led to a significant increase in investigations driven by whistleblowers and others.

(e)     Bonnie Amoia and MaryAnn Muise formed the consulting company Healthcare Management Solutions, LLC ("HMS") and were brought into the St. Vincent's assignment by S&W because of HMS' reimbursement knowledge. HMS has continued in the role and are still providing assistance to the reimbursement department today, making them to appear to be one of the few Huron/Speltz and Weis *per diems* that were retained after Huron and Speltz and Weis had been dismissed. HMS was the first-line of management that directed the preparation of accounting documents and supervised the lower level per diem and regular employees who performed these tasks that made clear the depth and extent of the outlier scheme.

(f)     The Relator reported the outlier fraud that he became aware to his boss, Bonnie Amoia, a principal of Defendant HMS, and Ms. Amoia told the Relator that she, in turn, had reported the outlier fraud to CFO Timothy Weis of S&W and later Huron; St. Vincent's Interim Vice President of Reimbursement Tamra Aloi of Huron; Dolly Ann York, a W-2 employee of St. Vincent's who headed up reimbursements; and Robert Mariani, a W-2 employee of St. Vincent's who was Vice President-Finance.

### The Accountants

13.     During the outlier fraud, at least into 2007, St. Vincent's auditors were KPMG. Its lead partner was Jim Martell. As the Hospitals' accountant, it prepared the audited financial statements. These auditing chores required KPMG to examine and certify the St. Vincent Hospitals' reserve accounts. Within these reserve accounts, was a "second set of books," a compilation of the size of the outlier fraud perpetrated against Medicare and Medicaid. KPMG's examinations of these accounts would necessarily have given it full knowledge of the outlier scheme. KPMG had an obligation to refuse to approve the Hospitals' outlier accounting and/or resign the assignment. It did neither. Moreover, in addition to its certification of the Hospitals' Medicaid Cost Reports (to the New York State Department of Health) that gave KMPG knowledge of the outlier scheme, KPMG also endorsed and covered up the scheme, rather than take more appropriate corrective actions. Its work-papers would reveal its culpability. Peter Somlai, the manager for KPMG, is now working for HMS.

### The Fiscal Intermediary

14.     (a)     Fiscal Intermediaries ("F.I."), under contract with CMS, are Medicare's gatekeeper (Medicaid's gatekeeper in New York were accounting firms, here KPMG) to safeguard the payment of Government Medicare reimbursements. The regional F.I. that was

required to keep an eye on the Hospitals' outlier claims in the period of the alleged fraud is Empire Healthchoice Assurance, Inc. (dba Empire Medicare Service) ("Empire"). As a result of CMS' recognition in 2002 of widespread outlier fraud among hospitals nationally, it issued Intermediary Program Memorandum Transmittal A-02-122, dated December 3, 2002, calling for an aggressive enforcement posture regarding outlier payments. CMS instructed its intermediaries to undertake a careful data analysis in preparation for compliance activity. Its follow-up memorandum, A-02-126 dated December 20, 2002, advised the intermediaries, *inter alia,* of the classes of hospitals to be audited. For example, it included hospitals that received outlier payments that had a total of more than 10% of their operating and capital DRG payments. Based upon these instructions, and the radical change in the outlier calculation methodology initiated by CMS in 2003, Empire was charged with the responsibility to take steps to assure that starting in August 2003, hospitals within its range of responsibility followed the new post-2002 outlier calculation rules. An F.I. who failed in this most elementary and crucial assignment defrauded the United States out of a portion, if not all, of its contractual payment to the F.I.

(b)      In this case, given the Hospitals' insolvency, Empire's recklessness and gross neglect was particularly egregious. Medicare's 2002/2003 regulations directed F.I.'s to take particular care to avoid overpayments to providers which were potentially insolvent or are the subject of bankruptcy proceedings. The applicable Medicare regulation provides that, "notwithstanding any other regulation or program instruction regarding the timing or manner of such adjustment, " when the intermediary believes that a provider may be insolvent, "any payments to the provider will be adjusted by the intermediary . . . to a level necessary to insure that no overpayment to the provider is made." 42 C.F.R. 413.64(i); PRM §2408.2. In this situation, Empire pointedly was on notice and aware of the Hospitals' insolvency, had the

obligation to the Government to take care that Medicare funds were not wasted through disbursement to bankrupt entities. Rather, Empire ignored all the outlier warnings, allowed the Hospitals' to file for outlier payments under a rescinded rule, paid no attention to dramatic and unprecedented exponential growth in outlier payments – which went from 0.3% to over 24% of DRG payments – and never took a first step to inquire into this anomaly. Under these circumstances, Empire, as F.I., defrauded the Government of the funds it was paid to be the Government's watchdog and is liable for the illicit outlier payments made to the Hospitals.

## V.     THE MEDICARE AND MEDICAID PROGRAMS

15.     Medicare and Medicaid are the principal federal programs that help pay for health care furnished by non-government providers. The federal annual share of the cost of Medicare and Medicaid is $500 billion, one-fifth of the national $2.5 trillion budget. The states' Medicaid costs are an additional $200 billion.

16.     The Medicare program, created in 1965 by the enactment of Title XVIII of the Social Security Act, pays for necessary medical services rendered to people over the age of 65 and other eligible recipients. The Center for Medicare and Medicaid Services ("CMS") of the United States Department of Health & Human Services issues comprehensive guides governing reimbursement for the cost of covered medical services provided to eligible patients. The Medicare program consists of two parts: Part A and Part B. Part A, funded by Social Security taxes, provides major medical insurance coverage for the costs of hospital care, related post-hospital services, home health services and hospice care. See generally 42 U.S.C. §§11395c-395i-4. Part B is a federally subsidized, voluntary health insurance program. It provides supplemental insurance coverage for medical and other services excluded from Part A, including laboratory diagnostic services. See generally 42 U.S.C. §§1395c-1395i-4.

17. New York State's Medicaid Cost Reports are governed by the same allowable cost rules as apply to reimbursement under Medicare's Title XVIII regulations. New York State Department of Health, Laws and Regulations, Title 10, Section 86-4.21-Allowable costs.

18. Federal funding of Medicare and Medicaid is protected by the False Claims Act from fraudulent and wrongful claims, including schemes to falsely certify compliance with the applicable laws, rules and regulations.

19. As a prerequisite to Medicare reimbursement of the cost of eligible medical service rendered to Medicare beneficiaries, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as a hospital cost report. After the end of its fiscal year, the hospital files its cost report, itemizing the reimbursement claimed for that year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; 42 C.F.R. § 405.1801(b)(l). Medicare relies upon the cost report to determine whether the hospital has been underpaid and is entitled to reimbursement beyond the interim Medicare payments, or whether the hospital has been overpaid and must reimburse Medicare, including outlier reimbursement. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1). At all times relevant to this action, St. Vincent was required to file Medicare and Medicaid cost reports.

20. St. Vincent Catholic Medical Center ("St. Vincent" or "Hospitals"), acting under the direction and control of the Defendant-consultants and accountants, is required by law to submit complete and truthful information in their Medicare cost reports. Failure to do so, such as secretly maintaining a false second set of books which contradict the truthfulness of the information presented to the Government on the cost reports, and which support a claim for unwarranted outlier reimbursement, implicates the False Claims Act.

21.     Every Medicare hospital cost report contains an express certification signed by the hospital's chief administrator or the administrator's designee.  Hospitals filing their cost reports electronically are required to submit a paper certification, which must be signed and dated.  *See* 42 C.F.R. § 413.24(f)(4).  Medicaid cost reports submitted to NYS DOH must be certified by a CPA.

22.     St. Vincent's Medicare cost reports for the calendar years 2005-2007 contained the following:

> Misrepresentation or falsification of any information contained in this Cost Report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.
>
> Certification by officer or administrator of provider(s)
>
> I hereby certify that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the balance sheet and statement of revenue and expenses prepared by [name and provider number of provider] for the cost reporting period beginning [date] and ending [date], and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations.
>
> (Signed) _____(Signature on File)_____
> Officer or Administrator of Provider(s)

23.     The Government contracts with insurance companies (referred to as "intermediaries") to administer the Medicare program.  Generally, health care providers submit cost reports to the intermediary retained by the Government.  The intermediary tentatively settles

the annual accounts, and this tentative settlement remains subject to further review, which often does not occur until two or more years later.

24.     A previous-year's cost report was used to estimate current-year Medicare entitlement.  This permitted hospitals to receive funds on an interim basis throughout the year, rather than only at year's end.  Occasionally, interim payments will result in greater Medicare reimbursement than ultimately proves due.  In such circumstances, annual cost reports serve to calculate the refund due Medicare from the provider.  A false claim related to a refund owed to the Government is known as a "reverse" false claim under the False Claims Act.  See 31 U.S.C. § 3729(a)(7).

25.     A hospital is required to certify that the filed hospital cost report is:  (i) truthful, *i.e.*, contains only true and accurate cost information; (ii) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with the applicable instructions; and (iii) complete, *i.e.*, that the cost report is based upon all information known to the hospital.

26.     Certain components of Medicare reimbursement are based in whole or in part on actual costs incurred:  (i) hospitals' direct costs of providing Medicare services to outpatients; (ii) Medicare's contribution toward hospitals' capital costs, based on the proportion of resource used by Medicare patients; (iii) educational costs; and (iv) ancillary services such as radiology and laboratory (based upon Medicare's share of costs).  Thus, Medicare reimbursements remain directly dependent on accurate hospital cost reporting, including the reporting of administrative and general expenses such as advertising

27.     Medicare now pays all direct and indirect non-capital costs associated with inpatient care on a fixed fee schedule (while reimbursement for outpatient care remained cost-based until August 2000, and has been based on Ambulatory Payment Classifications or APCs

since September 2000). The amount Medicare pays on an inpatient DRG code is generally the same regardless of actual costs incurred.

28.     Violations of the Medicare and Medicaid health care programs, such as here alleged, are each independently actionable under the FCA and comparable NYS false claim acts.

## VI.     **DEFENDANT'S WRONGFUL CONDUCT**

### The Methodology of the Illegal Outlier Scheme

29.     Cost outlier payments are designed to protect hospitals from large financial losses resulting from unusually expensive in-patient cases. Medicare regulations have established several steps to determine whether a hospital is entitled to receive an outlier payment for services it furnishes to a Medicare patient and how much the outlier payment will be. (42 C.F.R. §412.84.) First, the hospital's charges for the services furnished to the Medicare patient are adjusted to reflect the hospital's own costs of those services. To do this, a hospital generally must use its own ratio of costs to charges ("RCC"). The hospital's charges, adjusted to costs, are the product of the hospital's charges for the services furnished to the Medicare patient multiplied by the hospital-specific RCC.

30.     By 2003, however, CMS had determined that some hospitals, in an attempt to maximize outlier payments, were raising their charges faster than were their costs increasing, to take advantage of the time lag between when charges were billed and the RCCs that would be used to convert these charges to costs. During the time period lag – caused by the fact that the RCC to use was the one determined from the most recent *final* cost report, but typically such a cost report was a number of years old – these hospital's higher (unwarranted) charges were translated into costs using an inflated RCC from a prior year's cost report, thus qualifying the costs of more patients to be eligible for outlier reimbursement. Moreover, such arbitrary

16

increases in charges were so far above costs, that the applicable RCCs fell below prescribed reasonable limits, in which case the rules allowed these hospitals to substitute higher statewide RCCs in calculating outlier payments (the larger the RCC fraction, the larger the outlier payment).

31.     In order to insure that only truly high-cost cases would receive outlier payments, the Centers for Medicare and Medicaid services ("CMS") published a final rule, in effect as of August 2003, changing the reimbursement methodology for cost outliers under the acute care hospital inpatient prospective payment system. The revised CMS methodology for determining which patients' costs qualified for outlier payments became effective in August 2003. The fraud herein alleged against the Defendants is that starting in 2005, once Speltz and Weis and Huron had been on-board at the Hospitals for over a year, and had achieved control over the Hospitals' reimbursement functions, continuing at least to 2007, displayed a blatant disregard for the new 2003 rule. Rather, they took advantage of the improper and fraudulent conduct that CMS had outlawed – a gaming of the outlier system – in order to defraud the Government for outlier reimbursement.

32.     The fact that CMS's fiscal intermediary charged with screening such outlier requests for legitimacy failed to stop the Defendants, and, indeed, permitted these easily identifiable corrupt practices to be initiated and maintained, was highly injurious to the United States. Notwithstanding that CMS promulgated criteria to assist the fiscal intermediaries to identify those hospitals that were defrauding the outlier reimbursement provisions, Empire did nothing to stop the exorbitant outlier claims presented by the Hospitals, did not require the Hospital to follow the new CMS 2003 rule, did not do the analysis required by CMS, nor did the F.I. take steps to obtain outlier refunds from the Hospitals. This level of recklessness strongly

implicates FCA liability for the fiscal intermediary. The F.I. bad conduct occurred despite CMS' publication of criteria directed to hospitals to perform self-audits, and to focus on whether hospitals' charges had been increasing rapidly. The Defendants, all of them, ignored the CMS directive; in fact, they knowingly ignored the new CMS outlier rule altogether.

### Direct and Independent Knowledge of the Fraud

33.     The Defendant-consultants hired a large *per diem* staff to perform as financial consultants for the Hospitals. Frank Wegner, a regular employee of the Hospitals, who did the monthly reports for the Brooklyn and Queens branches of the Hospitals and was the Director of Reimbursement for the Brooklyn and Queens Hospitals prepared outlier claims to the Government that were in complete violation of the outlier rules and explained his actions thusly: "every month we set up a reserve for the wrongly claimed outlier revenue; we're getting overpaid and we shouldn't be doing it." As Wegner left to work for New York Downtown Hospital and other employees left, more *per diem* personnel got involved with the accounting for the Hospitals' Manhattan and Staten Island branches. Although the Defendant-consultants were told by them, "this outlier claiming isn't right," the executives from Huron, and Speltz and Weis responded, "we need the money." Detailed analyses of the amounts owed back to Medicare as a result of the wrongful outlier claims were prepared, but under the direction of the Defendant-consultants, the improper conduct continued unabated.

34.     The accounting ledgers and work-papers of the outlier overages and the reserves that were set up as hedge against a Medicare/Medicaid claim for refunds should be preserved in the Hospitals' main computer systems. Moreover, on a monthly and yearly basis, the Hospitals' charges on its Charge Master were regularly marked up, by enormous and unjustifiable increases, as an integral part of the Defendants outlier scheme, in order that excess payments

from Medicare and Medicaid under the pre-2003 rules would continue to flow. The Defendants' total outlier theft approximated $15 million annually, for 2005, 2006 and 2007.

35.    Along with the Defendant-consultants, the Defendant KPMG knew of the outlier overpayments, because it audited and certified the correctness of the Hospitals' reserve accounts, which had been set up to account for the unlawful outlier payments that had been received and, if discovered by the Government, would have to be returned to the Government. KPMG understood that the Medicare and Medicaid reserves were for the outlier over-reimbursement that was received because the rescinded outlier formula was used instead of the new formula that was instituted by CMS in August 2003.

## VII.   AS THE EXECUTIVES WHO DIRECTED THE OUTLIER SCHEME, HURON AND SPELTZ AND WEIS DECEIVED ST. VINCENT AND VIOLATED THEIR DUTY OF LOYALTY TO THE HOSPITAL

36.    In 2004, St. Vincent retained Speltz and Weis to provide management services and its two principals were made the interim chief executive office and chief financial officer. Huron acquired Speltz and Weis (and renamed it Wellspring Management) in May of 2005 and St. Vincent filed for bankruptcy on July 5, 2005.

37.    In 2004, 2005, 2006 and 2007, the Defendants Huron and Speltz and Weis conducted themselves in the following ways in order to perpetrate their outlier scheme:

- Defendants Huron and Speltz and Weis literally seized control of the St. Vincent Catholic Medical Center and its Hospitals, and acted on the Defendants' self-interests and their disregard for their fiduciary duties to the Hospitals, thereby causing the Hospitals to seek and obtain, through false claims and false presentments, approximately $50 million in undeserved outlier payments, for the benefit of the Defendants.

- In January 2004, Speltz and Weis undertook positions of trust and confidence as officers of Saint Vincent, with day-to-day managerial control of the system's operations. By the end of September 2004, Saint Vincent's need to restructure its operations required the hiring of bankruptcy counsel. The law firm, in turn,

brought in Huron Inc., to provide additional financial advice for the ailing institution.

- Saint Vincent's net operating losses under Speltz and Weis almost doubled during 2004. Speltz and Weis exploited their positions by embedding numerous independent contractors to serve in numerous key positions. These costs were billed at a markup that created a significant revenue stream for Speltz and Weis. At that same time, Speltz and Weis began secret discussions with Huron to sell their business to Huron for a value derived from the revenue generated from the Saint Vincent engagement. Huron and S&W signed a confidential agreement to conceal their negotiations in January 2005. It thereafter became a May 2005 acquisition agreement that paid Speltz and Weis $17 million, all but $3 million upfront. Speltz and Weis repeatedly and wrongly misrepresented to Saint Vincent's Board of Directors ("Board") that significant progress had been made to rehabilitate the hospital system's ailing financial condition. Speltz and Weis convinced the Board that it was not necessary to take prompt action on bankruptcy, causing Saint Vincent to lose tremendous savings. If bankruptcy had been pursued then, that would have had a negative impact on Speltz and Weis and Huron by undermining their incentive to consummate the sale of Speltz and Weis.

- The laws and procedures of the bankruptcy process prohibited the dual employment of Speltz and Weis and Huron as Saint Vincent's advisors, and would have also required full public disclosure of their secret negotiations. After filing for bankruptcy on July 5, 2005, Speltz and Weis were terminated, but Huron was continued by Saint Vincent out of necessity due to the fact that so many key independent subcontractors had been embedded into the Saint Vincent system. In 2004, after Speltz and Weis had been on the scene for nearly a year, Saint Vincent's net operating loss grew to $143.4 million from the prior year's $81 million. With the extension of their consulting agreement with Saint Vincent in hand, Speltz and Weis signed their agreement with Huron that same day.

- A report commissioned by the St. Vincent Board of Directors concluded that Speltz and Weis violated St. Vincent's internal conflict of interest policy, breached their agreement, breached their fiduciary duty, and became incapable of managing the work of Huron, the Board delegated S&W's responsibilities to Huron.

- Over many months, the Defendants struggled to win the support of the U.S. Trustee for practically any arrangement that would permit the retentions of Defendants as consultants for St. Vincent and be paid.

38. The fraud perpetrated by the Defendants is made explicit by the books and records of the Hospitals. In some respects, this documentation forms a normal part of the Hospitals' regular books; in other respects, the entries in these documents both reflect the fraud

and endeavor to cover it up; in yet other documentation, separately-maintained, secretive documents, not part of the regular books and records, have been prepared and maintained by the Hospitals to keep track of their outlier theft. This latter category acts as a second set of books, altogether, these documents establish the existence of outlier fraud.

39.     Documents prepared and maintained by the Defendants, on behalf of the Hospitals, fully advised HMS, CFO Timothy Weis, Robert Mariani, and the executives who were part of the Huron and/or Speltz and Weis contingent of the outlier fraud. To continue the high *per diem* payments that these Defendants were receiving, the Hospitals had to generate revenue; the Hospitals' abilities to generate revenue had been severely compromised; the whole system was operating at a loss. Nonetheless, by generating the unjustified outlier monies, Huron and Speltz and Weis were marshaling assets to pay themselves.

40.     One set of documents is a spread sheet, with key column 10, that captures both the appropriate Ratio of Cost to Charges (RCC), .2330, to be applied to determine the outlier amount as required by CMS' new, August 2003 outlier rule and also shows the outlier amount actually received for the Hospital a set of patients for a year when a much higher, unlawful RCC was used, .3910. The difference in the amounts is significant. The spread sheet compared the outlier reimbursement of what it ought to have been to what was billed to the Government. For the appropriate RCC of .2330, the total outlier reimbursement for this Hospital for 2006 should have been approximately $1,264,720. However, what was billed to Medicare under revoked RCC of .3910 was $7,041,773. The fraudulent overage was $5,777,053 (in fact, the overage would have been greater, since they effect of the greater-than-permissible charges should also have been factored out). Similar analyses exist for all years in questions for all of St. Vincent's Hospitals.

41.     The purpose of the CMS 2003 change in the outlier formula, done to stop the "gaming" of the Medicare and Medicaid outlier programs, was to make the RCC a more rational number.  Under the old, pre-2003 rule, the ratio was taken from the last finalized cost report.  Due to a lag time in the finalization of cost reports, a stale RCC could be available for use for two, three, four or more years.  Hospitals took advantage of this lag by dramatically increasing their charges, but then being able to use the illegitimate higher charges for outlier purposes, by using the stale RCC, rather than what should have been a much lower, actual RCC for the new year.  The actual RCC for the new year, if computed and used, would be a smaller ratio, because the increase in charges, used in the outlier formula as the denominator in the RCC formula, as it became larger, would decrease the size of the fraction.

42.     Another internal Hospital document summarized of all third Party liability accounts, *e.g.*, the Hospital's reserves.  It was prepared by HMS, and was then given to the St. Vincent's auditor, KPMG.  The accounting firm audited and certified it for correctness, for both the audited financials and the audited/certified Medicaid cost reports which KPMG knew was submitted to the Medicaid program.  It showed the 2006 amount reserved by the Staten Island hospital for outlier overpayments, starting with the amount from 2005, $2,120,647, increased by 2006's $2,674,822, for a total of $4,795,469 for the two years.  To validate this summary and reserve account as part of its certified audit, KPMG learned of the issue, and realized that these funds were owed back to the Government, but it played along, adopting the other Defendants' theme, we'll pay it back if we get caught.  It should be noted that the schedule states, "see separate file for calculation."  This file would have been part of the KPMG work-papers, and would have shown the improper use of the pre-2003 outlier rules.

43.     Another such document paints a picture of blatant outlier fraud for the Staten Island facility.   This document, the PS&R, is the provider's statistical and reimbursement summary of payments by Medicare to the Staten Island branch of St. Vincent.  Before the 2005 outlier onslaught of St. Vincent by Huron/Speltz/Weis, its total outlier reimbursement in 2004 was $100,658.  It jumped in 2005 and 2006, respectively, to $3,138,894 and $3,044,714.  In 2004, outlier was 0.3% of Federal Specific payments of $31,655,797.  In the years 2005 and 2006, while the Federal Specific payment amounts shrunk to $27,476,113 and $27,352,799, respectively, the outlier percentages grew to 24.9% and 11.1%.  The 2006 percentage of 11.1% will grow, when outlier payments for 2006 are received in later years, as 2005's grew from 11.44% to 24.9%.

44.     Another example of a "second set of books," meant to be unknown to the Government, were disclosed to the Hospitals' *per diem* administrators, namely Huron/Speltz/Weis.  This documentation, consisting of "revised" accounting, compared, for the Staten Island facility, the outlier payment the Government was deceived into paying, $2,927,853, with what should have been the correct amount, $342,486.  It also memorialized the enormous leaps in outlier payments, undoubtedly attributable to the fraud begun by the Defendants in 2005, as shown by a comparison of the outlier percentage of inlier payments, 1.9%, 0.4% and 0.3 to 11.4% and 11.1%, for years 2002 through 2006.

45.     Within another set of documents, there are schedules pertaining to Mary Immaculate and St. John's, Hospitals in Queens – but representative of schedules that were prepared every year of the fraud for all the hospitals in the St. Vincent's system – which help to complete the picture. Medicare outlier revenues for 2006 are said to have been $829,762. This is the amount that the Hospital placed into its budget for outlier receipt; it is not the full amount

received from the Government, however, because the excess was placed into the reserve fund. Even after the higher, fraudulent amounts had been received in prior years, the Hospital officials were so aware of their fraud, they planned to put a large portion of the illegally-obtained outlier funds directly into the reserve account, and therefore excluded them from their annual budgets. The Relator estimates that $829,762 is one-third of total outlier received. In other words, besides the $829,762, another $1.7 million was reserved for, in case the Government caught on to the scheme. The outlier payment was excessive because even under the pre-2003 rules, when a stale RCC could be used, it was improper to use an exaggerated "charges" schedule. That misuse of "charges" was the gaming of the system that caused CMS to revise the rules. This type of planning would have been discovered by KPMG's audits that it certified – and Empire, the fiscal intermediary, knew this too, unless it recklessly chose not to perform the analyses required under its contract with Medicare. On this same sheet, the fraudulent outlier reimbursement taken from Medicaid is listed to be $1,249,340. Here, the Hospital and its managers were so unimpressed with the ability of the Medicaid program to catch on, it never bothered to reserve any of it. One hundred percent of the outlier, much of it illegally obtained, was booked into the budget of the Hospital (its total, as discussed above, was way too high, because of a misuse of exaggerated "charges" as the surrogate for costs).

46.    Documents for St. John's Hospital for its 2006 outlier receipts from Medicare and Medicaid have a Medicare payment, $1,521,092, plus the remainder, over $3 million, reserved. The bulk of all these dollars were fraudulent, even under the pre-2003 rules. The Medicaid full amount of $2,120,511, an excessive outlier payment, was booked into the budget, as had been done for Mary Immaculate. Medicaid's census of patients was approximately one-third of the total patient population, whereas Medicare census was closer to fifty percent.

47. Other data relevant to the invalidity of the outlier claims of St. Vincent's Catholic Medical Center in Manhattan, shows Net Patient Service Revenues remained relatively flat 2002 through 2006, $460 million to $476 million (2002-2005), with an increase to $539 million in 2006, while outlier revenue grew exponentially, but simply as a consequence of an unrealistic growth in charges. While the facility's outlier amounts remained stable 2002 through 2004, growing from $4 million to $5.4 million, it exploded after Huron and Speltz and Weis appeared on the scene and had taken control and grew to $19.8 million and $19.4 million in the years 2005 and 2006. In other words, compared to net revenue, it leaped 400% to 500%, without any legitimate basis for such growth. Similar outlier growth was exhibited by St. Vincent's branches in Queens, Brooklyn and Staten Island.

48. The Hospitals' system's Gross Patient Service Revenue, also known as "charges," was $1.7 billion for the years 2005 and 2006, compared to $1 billion and $1.2 billion in years 2003 and 2004. The 2005 and 2006 increases, however, were artificial, as demonstrated by concomitant increases in Contractual Allowances (the discounts afforded to major payers), which increased to $1.2 billion in years 2005 and 2006 from $500 and $700 million in years 2003 and 2004. Net income remained stable, therefore, notwithstanding a 33% increase in charges. The net effect was to increase outlier revenues – heavily dependent upon "charges," to $20 million and $19 million in the years 2005 and 2006, as compared to outlier amounts of $5 million in the years 2003 and 2004. The Staten Island site showed similar outlier manipulation. Charges increased to $900 million in the years 2005 and 2006, after having been at the $500 million level for 2003 and 2004. This equates to a 42% increase in charges

49. In the first instance, the amounts of the false outlier claims were determined and authorized, not by the Hospital or its agents, but by Medicare's fiscal intermediary, Empire,

based upon data that the Hospitals and its agents had submitted to Medicare. As a result of Empire's reckless calculations and/or disregard of CMS' 2003 rule change, excessive Outlier reimbursements were made by Medicare to the Hospitals. Thereafter, the other Defendants knowingly allowed the excessive and fraudulent Medicare Outlier overpayments to the Hospitals to continue being paid for three years or longer, during which time Defendants took permanent possession of the Outlier overpayments and failed to refund them to the federal government.

50. On an annual basis, the Hospitals submitted cost reports to Medicare. Thereupon, Medicare's Fiscal Intermediary ("FI"), Defendant Empire, calculated the 2005 to 2007 Medicare Outlier reimbursement amounts based upon the information contained in the Medicare cost reports. The FI recklessly, without an excuse, applied the wrong rule of outlier calculation.

51. It was the FI's responsibility to apply the new rules, but here it failed to do so, thus opening the door to over-reimbursements. Empire's reckless disregard of the outlier rules caused excessive reimbursements to be paid to the Hospitals. Empire continued to use the outlawed .3910 fraction.

52. Before the Defendants sought to defraud the outlier payment system, it submitted Medicare Cost Reports that were basically correct, and the fiscal intermediary Empire calculated an RCC when the reports were finalized. However, when the Defendants increased its "charges" by exorbitant amounts, and Empire failed to take this into account by comparing one year's cost report to the next, and Empire wrongly used a time-lagged RCC, the outlier fraud was consummated. Empire paid increased outlier amounts for several years without noticing or caring about the increased charges or the overpayments. The two evils – time-lagged RCCs and unwarranted increases in charges – identified by CMS in its 2002 memoranda to fiscal intermediaries and invalidated by its 2003 rule change– were precisely the steps orchestrated by

26

the Defendants. And, notwithstanding CMS' explicit instructions to Empire to be on guard for such misconduct, Empire's reckless disregard led it to do nothing about the fraud. Empire calculated the excessive outlier amounts that were paid to the Hospitals, whereas, it should have become aware of the change in the RCC through its examination of the next year's cost report and it should have followed CMS' rule not to use time-lagged RCCs.

## VIII. DAMAGES

53.     As set forth above, Defendants knowingly submitted or caused to be submitted to Medicare and Medicaid reimbursement claims that were based upon violations of the Federal and state false claims acts, related to outlier reimbursement, for the period 2005 to at least 2007, in violation of 31 U.S.C. § 3729 and the comparable NYS statute, causing damages to the United States' Medicare and Medicaid programs. The Relator estimates that Defendants' false and fraudulent conduct resulted in the Federal and state governments paying in excess of fifty million dollars pursuant to false claims prohibited by the respective FCA statutes, which constitute actual damages, without regard to fines or penalties.

## FIRST CAUSE OF ACTION

### False Claims Act: Presentation of False Claims and Making and Using a False Statement or Record (31 U.S.C. § 3729 (a)(1) and (a)(2)).

54.     Plaintiff repeats and re-alleges each allegation in paragraphs 1 through 53 of this Complaint, as though fully set forth herein.

55.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729 et seq.

56.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States. Government for payment or approval by Medicare and Medicaid.

57.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false and/or fraudulent records and statements, to induce the Government's Medicare and Medicaid programs to approve and pay such false and fraudulent claims.

58.     By virtue of the act described acts above, Defendants have falsely certified its compliance with all applicable statutes in connection with the submission of Medicare and/or Medicaid reimbursement forms from at least January 1, 2005 through 2008.

59.     Each claim submitted by and each reimbursement received by Defendants that was as a result of a false or fraudulent record or statement and/or a false or fraudulent claim for payment.

60.     The Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented on behalf St. Vincent's for hundreds of patients, from the period at least from 2005 to 2007. Relator has no control over or access to the records of such false claims which are within the control and custody of St. Vincent.

61.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid the claims that would not be paid but for the Defendants' false statements and false claims.

62.     By virtue of the false or fraudulent claims made by Defendants, the United States has suffered and has been damaged, in substantial amounts to be determined at trial. The Medicare and Medicaid programs have paid hundreds, if not thousands, of claims, amounting to million of dollars, for illegal reimbursements that were obtained by the Defendants, from 2005 to

2007, and, therefore, the United States is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $11,000 for each violation.

## SECOND CAUSE OF ACTION

### False Claims Act: Failure to Refund "Reverse False Claims (31 U.S.C. § 3729 (a)(7))

63.     Plaintiff repeats and re-alleges each allegation in paragraphs 1 through 62 of this Complaint, as though fully set forth herein.

64.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729 et seq.

65.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

66.     By virtue of the acts described above, Defendants knowingly failed to refund to the United States outlier funds unlawfully obtained from Medicare and Medicaid in violation of the False Claims Act

67.     The Relator cannot at this time identify all of the false claims that should have been repaid to the United States. Such non-payments were caused by Defendants' conduct. The false claims to be refunded were presented on behalf St. Vincent's for hundreds of patients, from the period at least from 2005 to 2007. Relator has no control over or access to the records of such false claims which are within the control and custody of St. Vincent.

68.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, concerning claims that would not be paid but for the Defendants' false statements and false claims.

69.     By virtue of the false or fraudulent failure to re-pay by Defendants of aforesaid claims, the United States has suffered and has been damaged, in substantial amounts to be

determined at trial. The Medicare and Medicaid programs have paid hundreds, if not thousands, of claims, amounting to million of dollars, for illegal reimbursements that were obtained by the Defendants, from 2005 to 2007, and, therefore, is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $11,000 for each violations.

## THIRD CAUSE OF ACTION

### False Claims Act: Conspiracy to Submit False Claims (31 U.S.C. § 3729 (a)(3))

70.     Plaintiff repeats and re-alleges each allegation in paragraphs 1 though 69 of this Complaint, as though fully set forth herein.

71.     This is a claim for false damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

72.     By virtue of the act described above, Defendants conspired with others, to defraud the United States by creating an illegal outlier reimbursement scheme in violation of the False Claims Act. Defendants took substantial steps in furtherance of the conspiracies by, *inter alia*, agreeing to prepare and submit false and fraudulent claims and statements in support thereof to Medicare and Medicaid, and did fail to refund outlier dollars unlawfully received from Medicare and Medicaid.

73.     The Government, unaware of the Defendant's conspiracy, paid claims that would not have been paid absent the unlawful conspiracy.

74.     By virtue of Defendant's conspiracy and the acts taken in furtherance thereof, the United States has been damaged in substantial amounts to be determined at trial. The Medicare and Medicaid programs have paid hundreds, if not thousands, of claims, amounting to millions of dollars, for illegal outlier reimbursements that were obtained by the Defendant, from 2005 to

2007, and, therefore, the United States is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $11,000 for each violation.

## FOURTH CAUSE OF ACTION

### State of New York False Claims Act N.Y. Stat. Fin. § 187, et. seq.

75. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 74 of this Amended Complaint.

76. This is a claim for treble damages and penalties under the State of New York False Claims Act.

77. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the State of New York Government for payment or approval.

78. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of New York Government to approve and pay such false and fraudulent claims.

79. The State of New York Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid claims that would not be paid but for Defendant's illegal claims and statements in support thereof for outlier reimbursement under the NYS Medicaid program.

80. By reason of the Defendant's acts, the State of New York has been damaged in an amount to be determined at trial.

81. The State of New York is entitled to the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

## PRAYER

WHEREFORE, Relator/Plaintiff prays for judgment against the Defendants as follows:

(a)      That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq. and the equivalent provisions of the NYS statute set forth above;

(b)      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

(c)      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of Defendants' actions, plus a civil penalty of $12,000 for each violation of N.Y. State Fin. § 187, et seq.;

(d)      that Relator/Plaintiff be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) by the federal False Claims Act, and the equivalent provisions of the state statute set forth above;

(e)      that Relator/Plaintiff be awarded all costs and expenses of this action, including attorneys' fees and expenses; and

(f)      that Relator/Plaintiff recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator/Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: December 1, 2009
New York, New York

Respectfully submitted,

MICHAEL LAW GROUP

By: _____

Philip R. Michael
The Chrysler Building
405 Lexington Avenue, Ninth Floor
New York, NY 10174
(917) 689-1734 (phone)
(212) 319-3216 (fax)

TROUTMAN SANDERS LLP

By: _____

Charles P. Greenman
Eric Unis
405 Lexington Avenue
New York, NY 10174
(212) 704-6000 (phone)
(212) 704-6288 (fax)