**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X

UNITED STATES OF AMERICA, THE STATE OF      :
NEW YORK, *ex rel.* ASSOCIATES AGAINST
OUTLIER FRAUD,                                              :

              Plaintiffs,                    :

     v.                                                        :          No. 09 CV 1800 (JSR)

HURON CONSULTING GROUP, INC., and EMPIRE      :
HEALTHCHOICE ASSURANCE, INC. (D/B/A EMPIRE
MEDICARE SERVICES),                                       :

            Defendants.                :
--------------------------------------------------------------------X


**DEFENDANT HURON CONSULTING GROUP, INC.'S, MEMORANDUM OF POINTS**
**AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE RELATOR'S**
**CLAIMS UNDER FED. R. CIV. P. 9(b) AND 12(b)(6)**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................................1

I.       THE REGULATORY FRAMEWORK ................................................................................2

II.      THE RELATOR'S ALLEGATIONS .................................................................................7

ARGUMENT ............................................................................................................................11

I.       POINT ONE:  THE RELATOR'S FEDERAL FCA ALLEGATIONS DO NOT
         SATISFY RULE 9(b)...........................................................................................................11

         A.       The Relator's Complaint Does Not Satisfy Rule 9(b) because Relator Does
                  Not Identify A Single False Statement or Claim.................................................13

         B.       The Relator's Complaint Does Not Satisfy Rule 9(b) Because Relator Fails To
                  Identify How the Hospitals' Outlier Claims were False in Light of Their
                  Costs and Lacks Other Indicia of Reliability .....................................................16

         C.       The Relator's Generalized Allegations Undermine the Purposes Underlying
                  Rule 9(b).............................................................................................................18

II.      POINT TWO:  THE RELATOR'S FEDERAL FCA ALLEGATIONS SHOULD BE
         DISMISSED UNDER RULE 12(b)(6)...........................................................................19

III.     POINT THREE:  THE RELATOR'S NEW YORK STATE FCA CLAIMS SHOULD
         ALSO BE DISMISSED .....................................................................................................21

CONCLUSION ........................................................................................................................23

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page

*Alnwick v. European Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 638 (E.D.N.Y. 2003) .............21

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)...............................19

*Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, No. 06 Civ. 3085, 2007 WL 867202, at *4 (S.D.N.Y. Mar. 21, 2007) ........................................................................................21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).........19

*Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) ......................................12

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 133 F. Supp. 2d 162, 166 (E.D.N.Y. 2001) ...................................................................................................22

*Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp*, 582 F.3d 1227, 1231 (11th Cir. 2009)....4

*Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 238 F.R.D. 679, 681-685 (S.D. Fla. 2006)..................................................................................2, 3, 4, 5

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988) ....................................................................................................22

*Burns v. Cook*, 458 F. Supp. 2d 29, 45 (N.D.N.Y. 2006) ..............................................21

*Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012-14 (11th Cir. 2005) .........................15, 16

*Fischer v. United States*, 529 U.S. 667, 685, 120 S. Ct. 1780, 146 L. Ed. 2d 707 (2001)...............2

*Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 427, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996)........................................................................................21

*Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1325-26 (11th Cir. 2009)............................13, 16

*Landgraf v. Usi Film Prods.*, 511 U.S. 244, 278, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994) ......22

*Longmont United Hosp. v. St. Barnabas Corp.*, No. 06-2802, 2007 U.S. Dist. LEXIS 48187, at *5 (D.N.J. June 26, 2007), *aff'd* 305 F. App'x 892 (3d Cir. 2009)...............................4

*Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989).........................................12

*Marcus v. Frome*, 275 F. Supp. 2d 496, 504 (S.D.N.Y. 2003) ...................................................21

*McGrath v. Toys "R" Us, Inc.*, 3 N.Y.3d 421, 821 N.E.2d 519, 522 788 N.Y.S.2d 281 (2004)....22

*O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) ................................11

*Pace v. Leavitt*, No. 07-4510, 2008 U.S. App. LEXIS 27716, at *3-*4 (3d Cir. Sept. 24,
     2008) ................................................................................................................................3

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ........................................11

*United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358-59 (11th Cir. 2006).....................15

*United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, No. 94-7316, 2000 U.S.
     Dist. LEXIS 12081, at *54 (E.D. Pa. Aug. 24, 2000) .................................................20

*United States ex rel. Bailey v. Ector County Hosp.*, 386 F. Supp. 2d 759, 764 (W.D. Tex.
     2004) ..............................................................................................................................16

*United States ex rel. Barlett v. Tyrone Hosp., Inc.*, 234 F.R.D. 113, 122 (W.D. Pa. 2006) ...........15

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) .........14

*United States ex rel. Camillo v. Ancilla Sys. Inc.*, No. 03-CV-0024-DRH, 2005 U.S. Dist.
     LEXIS 14638, at *10, *12 (S.D. Ill. July 18, 2005) ..........................................19, 20

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir.
     2002) ........................................................................................................................14, 15

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 198 F.R.D. 560, 564 (N.D. Ga. 2000),
     *aff'd*, 290 F.3d 1301 (11th Cir. 2002) ...............................................................12, 16

*United States ex rel. Romano v. New York-Presbyterian Hosp.*, 00-civ-8792,
     2008 U.S. Dist. LEXIS 17002, at *3-*6 (S.D.N.Y. March 5, 2008) ......................22

*United States ex rel. Godfrey v. KBR, Inc.*, No. 08-1423, 2010 U.S. App. LEXIS 244, at *15-*16
     (4th Cir. Jan. 6, 2010)...............................................................................................17

*United States ex rel. Grynberg v. Ernst & Young LLP*, 323 F. Supp. 2d 1152, 1155 (D. Wyo.
     2004) ..............................................................................................................................19

*United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006) ...............15

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 233-35 (1st Cir.
     2004) ........................................................................................................................14, 16

*United States ex. rel. Kinney v. Hennepin County Med. Ctr.*, No. 97-1680, 201 U.S. Dist. LEXIS 25475, at *32 (D. Minn. Aug. 22, 2001) ...................................................................20

*United States ex rel. Lacy v. New Horizons*, No. 08-6248, 2009 WL 3241299, at *3 (10th Cir. Oct. 9, 2009) ...................................................................14

*United States ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 679-80 (W.D. Tex. 2006) ...................................................................4

*United States ex rel. Meshel v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 689 (W.D. Tex. 2007) ...................................................................16

*United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp. at Hamilton*, No. 02-5702, 2009 U.S. Dist. LEXIS 38898, at *18 (D. N.J. May 6, 2009) ...................................................................16

*United States ex rel. Phillips v. Permian Residential Care Ctr.*, 386 F. Supp. 2d 879, 883 (W.D. Tex. 2005) ...................................................................15

*United States ex rel. Piacentile v. Wolk*, No. 93-5773, 1995 U.S. Dist. LEXIS 580, at *10-*11 (E.D. Pa. Jan. 13, 1995) ...................................................................19

*United States ex rel. Polansky v. Pfizer, Inc.*, No. 04-cv-0704, 2009 U.S. Dist. LEXIS 43438, at *13, *30-*31 (E.D.N.Y. May 22, 2009) ...................................................................12, 13

*United States v. Safe Env't Corp.*, No. 00-C-3509, 2002 U.S. Dist. LEXIS 8421 (N.D. Ill. May 13, 2002) ...................................................................20

*United States ex rel. Shaver v. Lucas Western Corp.*, 237 F.3d 932, 933 (8th Cir. 2001) ...................................................................19

*United States ex rel. Wood v. Applied Research Assocs.*, 328 F. App'x 744, 747, 750 (2d Cir. 2009), *cert. denied*, 78 U.S.L.W. 3439 (2010) ...................................................................11, 13

## STATUTES

42 C.F.R. § 412.80 ...................................................................2

42 C.F.R. §§ 412.84; (g); (h); (h)(2); (i)(2); (i)(4) ...................................................................2, 3, 5, 6, 7

42 U.S.C. §§ 1395ww(d); (d)(5); (d)(5)(A)(ii) ...................................................................2, 3, 5, 6, 8

68 Fed. Reg. 34,494; 34,496-98; 34,501-04 (June 9, 2003) ...................................................................2, 3, 5, 6, 7

N.Y. STATE FIN. LAW § 187-194 ...................................................................5, 6, 7, 22

N.Y. STATE FIN. LAW § 189(1)(a) ...................................................................21

## OTHER AUTHORITIES

CMS Transmittal A-03-058, Change in Methodology for Determining Payment for Outliers,
   at 1 (July 3, 2003) .................................................................................................................6

CMS Transmittal 707, IPPS Outlier Reconciliation (Oct. 12, 2005).............................................6

Defendant Huron Consulting Group, Inc. ("Huron") respectfully submits this Memorandum of Points and Authorities in support of its motion to dismiss the relator's complaint. The grounds for the motion are set forth below. Huron's Notice of Motion and the Declaration of its counsel, Robert S. Salcido, Esq., both dated February 2, 2010 (the "Salcido Decl."), accompany this Memorandum.

## PRELIMINARY STATEMENT

On February 26, 2009, the relator filed this action under the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C.S. §§ 3729-3733, and New York False Claims Act, N.Y. STAT. FIN. LAW § 187-194 (2010) ("N.Y. FCA"). The relator contends that defendants caused St. Vincent Catholic Medical Center and its member hospitals to present false claims and statements to receive inflated outlier payments under the Medicare and Medicaid programs. *See* First Am. Compl. ¶ 9 (Salcido Decl. Ex. A). On January 6, 2010, the government declined to intervene in the relator's action. *See* Salcido Decl. Ex. B.

The relator's FCA allegations should be dismissed under Fed. R. Civ. P. 9(b) because the relator does not even attempt to identify a single Medicare or Medicaid outlier claim or cost report containing allegedly "false" charges or costs that may have resulted in a violation of the FCA, and does not set forth any facts regarding hospital costs and the relationship between charges and costs that could have resulted in the submission of a false outlier claim. The relator's FCA allegations should also be dismissed under Fed. R. Civ. P. 12(b)(6) because the relator has not set forth sufficient facts to state a claim that Huron "caused" the hospitals to submit false claims in violation of the FCA.

For the same reasons, the relator's N.Y. FCA allegations should be dismissed for failure to state fraud with specificity and for failure to state a claim. Additionally, relator's N.Y. FCA

claims should be dismissed because the New York FCA did not exist during the apparent time period covered in relator's lawsuit.

## I.     THE REGULATORY FRAMEWORK

From its origin in 1965 until 1983, Medicare paid hospitals the "reasonable cost" of inpatient care.  In 1983, it replaced that system with the present Prospective Payment System ("PPS").  *See* 42 U.S.C. § 1395ww(d).  Under PPS, hospitals are generally paid a fixed payment based upon the average cost to treat the patient's type of illness (the "diagnosis related group" or "DRG"), regardless of the cost of care.  *See Fischer v. United States*, 529 U.S. 667, 685, 120 S. Ct. 1780, 146 L. Ed. 2d 707 (2001).

Congress recognized, however, that some cases would be so costly that hospitals would incur substantial losses on those cases under PPS.  Accordingly, PPS provides for additional payments for "cost outliers" as defined in 42 U.S.C. § 1395ww(d)(5)(A)(ii) (the "Outlier Statute").  The Outlier Statute is "designed to protect hospitals from large financial losses due to extremely costly cases which the DRG payment (or average cost estimate) cannot fairly accommodate."  *Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 238 F.R.D. 679, 682 (S.D. Fla. 2006).

A hospital receives outlier payments under the Medicare program's rules when certain charges associated with the treatment of a Medicare beneficiary exceed the Medicare standardized payment by a fixed amount.  42 U.S.C. § 1395ww(d)(5); 42 C.F.R. §§ 412.80, 412.84 (2010).  Specifically, the Outlier Statute authorizes additional payments "in any case where charges, adjusted to cost . . . exceed the sum of the applicable DRG prospective payment rate plus [other fixed adjustments] plus a fixed dollar amount determined by the Secretary."  42 U.S.C. § 1395ww(d)(5)(A)(ii).  For purposes of determining eligibility for outlier payments,

Medicare regulations mandate that a hospital's charges (i.e., what the hospital billed its patients) be multiplied by the hospital-specific cost-to-charge ratio ("CCR") – the quotient of the cost divided by the charge – to ensure that the Medicare fiscal intermediary pays only for the true cost of care. *See* 42 U.S.C. § 1395ww(d)(5)(A)(ii); 42 C.F.R. §§ 412.84(g), (h).[1] When the product of the charges and CCR, together with other costs, exceeds a fixed loss threshold (which the Centers for Medicare & Medicaid Services ("CMS") determine each year), the hospital is eligible to receive a certain percentage of those excess costs as an outlier payment. *Tenet Healthcare*, 238 F.R.D. at 683.

Conceptually, CMS' outlier payment methodology – multiplying a hospital's billed charges by its CCR – should accurately identify costly cases because if charges increase without a corresponding increase in costs, the hospital's charge increase will be immediately nullified by a lower CCR.[2] Before 2003, however, there was a significant flaw in the outlier payment methodology that allowed hospitals to manipulate their outlier payments. Under the pre-2003 methodology, the fiscal intermediary used a CCR based on the hospital's most recently settled cost report to calculate payments. *Id.* Since up to five years could lapse before the fiscal intermediary audited and settled a cost report, this CCR was potentially stale and did not

---

[1] Fiscal intermediaries are companies under contract with the government to perform administrative responsibilities under the Medicare program. *See Pace v. Leavitt*, No. 07-4510, 2008 U.S. App. LEXIS 27716, at *3-*4 (3d Cir. Sept. 24, 2008) (describing relationship). Since 2005, fiscal intermediaries have been known as Medicare Administrative Contractors ("MACs"). *Id.* Because the regulatory pronouncements and case law underlying the Medicare outlier program relevant to this lawsuit use the phrase fiscal intermediary, MACs will be referred to as fiscal intermediaries throughout this memorandum.

[2] For example, as the district court pointed out in *Tenet Healthcare*: "[I]f a hospital were to charge $1000 for services that cost $400, its cost to charge ratio would be 0.4. (or 400/1000)." 238 F.R.D. at 683. "[I]f a hospital were to charge $2000 for those same services that cost $400, its CCR would be 0.20 (400/2000)." *Id.* Multiplying the $2000 against the new CCR would still reflect the true cost of the service, $400, and accurately reflect that the true costs of the case did not increase.

necessarily reflect the hospital's current charges or costs for a current case. *Id.* Without an up-to-date CCR, increases in billed charges without corresponding increases in costs would result in the appearance that costs had increased because the hospital's charge would not be offset by a lower CCR. *Id.* at 683-84.[3]

As a result of this flaw in the outlier payment methodology, some hospitals allegedly engaged in the practice of "turbocharging," i.e., increasing their "Medicare reimbursements simply by charging higher prices for [their] medical services without a corresponding increase in the cost of the service." *Tenet Healthcare*, 238 F.R.D. at 681 (defining the term). The issue of hospitals allegedly turbocharging to garner inflated outlier payments became widely publicized in the Fall of 2002, which resulted in governmental investigations. *See United States ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 679-80 (W.D. Tex. 2006) (describing public disclosures). The government subsequently entered into several settlements with hospitals that it believed had increased their charges simply to qualify for additional outlier payments. *See, e.g., Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 582 F.3d 1227, 1231 (11th Cir. 2009) (describing Tenet's $900 million settlement with the government); *Longmont United Hosp. v. St. Barnabas Corp.*, Civ. Action No. 06-2802, 2007 U.S. Dist. LEXIS 48187, at *5 (D.N.J. June 26, 2007) (describing St. Barnabas' $265 million settlement with the government), *aff'd* 305 F. App'x 892, 892 (3d Cir. 2009).

---

[3] Again, employing the analysis in Footnote 2, if the charges increased from $1000 to $2000, costs remained constant, and the fiscal intermediary did not update the CCR because the cost report had not been settled, the CCR would remain 0.4 and thus it would appear that the hospital's costs per case had increased to $800 (2000 x 0.4) rather than the true cost of the case, $400. The appearance that the cost per case had dramatically increased would make it more likely that the case would qualify for a Medicare outlier payment.

To close the "loopholes" that existed in the regulatory scheme, CMS, beginning in 2003, instituted a number of reforms to its outlier payment methodology "to ensure that outlier payments are made only for truly expensive cases" and did not simply result from artificially high charge increases. Change in Methodology for Determining Payment for Extraordinarily High Cost Cases, 68 Fed. Reg. 34,494, 34,494 (June 9, 2003). *See also Tenet Healthcare*, 238 F.R.D. at 681, 685. For purposes of this lawsuit – which solely covers post-2003 conduct – three of CMS' reforms to fix existing vulnerabilities in the outlier program are particularly significant.

First, CMS' amendments authorize the fiscal intermediary to calculate outlier payments using a CCR based on a more current cost report. In particular, CMS instructed (for discharges occurring on or after October 1, 2003) that the CCR applied at the time a claim is processed must be based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period. *See* 42 C.F.R. § 412.84(i)(2). CMS explained that this would tie outlier payments more closely to actual costs because the hospital's billed charges (which reflect charge increases) would be adjusted to a CCR that also reflected recent charge increases. *See* 68 Fed. Reg. at 34,497.[4]

Second, CMS' amendments authorized it to direct the fiscal intermediary to revise hospitals' CCR if data indicated that their rate-of-increase in charges was outside that of their peers. *Id.* at 34,498. This reform sought to ensure that if a hospital engaged in rapid charge increases between its tentative settled cost report and the time a patient's claim was processed,

---

[4] As CMS explained, hospitals must submit their cost reports within five months after the end of their fiscal year. 68 Fed. Reg. at 34,497. CMS decides whether to accept a cost report within 30 days. *Id.* Once the cost report is accepted, CMS makes a tentative settlement within 60 days. *Id.* Thus, by using a tentatively settled cost report rather than a final settled cost report, the time lag for updating the CCR is reduced by a year or more, and the hospital's ability to increase charges to obtain additional outlier payments is substantially minimized. *Id.* at 34,497-98.

the hospital would not receive inflated outlier payments.  *Id.* at 34,497.  CMS issued detailed instructions in 2003, and again in 2005, on how fiscal intermediaries must identify hospitals that "appear to have disproportionately benefited from the time lag in updating the CCRs" and adjust their CCRs appropriately.  CMS Transmittal A-03-058, Change in Methodology for Determining Payment for Outliers, at 1 (July 3, 2003),

http://www.cms.hhs.gov/Transmittals/downloads/A03058.pdf; *see also* CMS Transmittal 707, IPPS Outlier Reconciliation (Oct. 12, 2005),

http://www.cms.hhs.gov/Transmittals/Downloads/R707CP.pdf.

Third, CMS' amendments made outlier payments subject to reconciliation when hospitals' cost reports are settled.  *See* 42 C.F.R. § 412.84(i)(4); 68 Fed. Reg. at 34,501.  Under this policy, payments would be processed throughout the year using a CCR based upon the best information available at that time.  *See* 68 Fed. Reg. at 34,501.  When the cost report is settled, however, any reconciliation would be based on the CCR computed from the cost report and charge data determined at the time the cost report coinciding with the discharge is settled.  *Id.* Further, if the reconciliation reflects an overpayment, the hospital's required repayment would reflect the time value of money.  *Id.*  By implementing this policy, CMS believed it would eliminate the potential for overpayments by providing "a mechanism for final settlement of outlier payments using actual cost-to-charge ratios from final settled cost reports."  *Id.* at 34,502; *see also* IPPS Outlier Reconciliation, CMS Transmittal 707.[5]

In sum, CMS promulgated each of these "new regulations to correct . . . vulnerabilities and to ensure that outlier payments are paid only for truly high-cost cases."  68 Fed. Reg. at

_____

[5] According to relator, Medicaid cost reports are governed by the same allowable cost rules as Medicare.  *See* First Am. Compl. ¶ 17.

34,496.  CMS specifically stated that "the changes in this final rule are designed to take away any incentive for hospitals to seek outlier payments that are excessive." *Id.* at 34,503.  CMS also noted that "the changes we are making in this final rule will largely ensure the payments hospitals receive for outlier cases are accurate . . . ." *Id.* at 34,504.

## II.    THE RELATOR'S ALLEGATIONS

The relator claims that defendants caused St. Vincent Catholic Medical Center and its member hospitals to submit false claims by failing to refund unwarranted outlier reimbursements.  *See* First Am. Compl. ¶ 1.  The relator alleges that this conduct occurred from January 1, 2004 to 2007, that is, after CMS promulgated its 2003 regulatory reforms.  *Id.*  The relator's complaint, however, does not specify the date or content of any particular false or fraudulent claim; identify any specific patients that received the services; list which charges were allegedly "excessively" inflated; discuss how the charges did not accurately reflect costs, resulting in an improper outlier payment; or identify the amount that should have been charged on individual claims.  Further, the relator does not explain how the allegations could be effectuated in light of CMS' 2003 regulatory reforms.

The relator broadly asserts that consultants Speltz and Weis initiated the outlier scheme starting in early 2004.  After eighteen months, Speltz and Weis allegedly partnered with Huron. *Id.* ¶ 12(b).  The relator contends that Huron provided leadership to the health system's administrative departments during its restructuring.  *Id.*

Without identifying specific hospital charges that were increased, and by how much, or why these charge increases were unjustified in light of specific hospital costs, the relator alleges that "on a monthly and yearly basis, the Hospitals' charges on its Charge Master were regularly marked up, by enormous and unjustifiable increases, as an integral part of the Defendants outlier

scheme, in order that excess payments from Medicare and Medicaid under the pre-2003 rules would continue to flow." *Id.* ¶ 34.

Aside from these general allegations, the relator points to some documents that it believes support its claim:

- In ¶ 40, the relator asserts that one document shows the "appropriate Ratio of Cost to Charges (CCR), .2330, to be applied to determine the outlier amount as required by CMS' new, August 2003 outlier rule and also shows the outlier amount actually received for the Hospital [sic] a set of patients for a year when a much higher, unlawful CCR was used, .3910." *Id.* But the relator does not: (1) tie that document to anyone at defendant Huron; (2) explain why the appropriate CCR should be .2330, e.g., by linking that CCR to any hospital's settled or tentatively settled cost report; (3) address whether CMS or the fiscal intermediary, through their normal procedures, applied the correct CCR when the cost reports were settled, or whether any excessive outlier payments were reconciled once the cost report was settled; (4) identify any specific outlier claim presented to the government that was paid under an incorrect CCR; or (5) explain with any specificity how, in any event, anyone at Huron would be responsible for applying an incorrect CCR, since it is the fiscal intermediary, and not the hospital or its consultants, that apply the CCR.[6]

---

[6] Moreover, the relator is simply wrong in asserting that the hospital "billed" an inaccurate CCR to Medicare. *See* First Am. Compl. ¶ 40. A hospital bills its charges and the fiscal intermediary applies a CCR to those billed charges. *See* 42 C.F.R. § 412.84(h) (the CCR is "computed annually by the intermediary for each hospital based on the latest available settled cost report for that hospital . . . ."); *id.* § 412.84(h)(2) (CCR "applied at the time a claim is processed . . . based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period"). Thus, the hospital could not have billed an incorrect CCR.

- In ¶ 42, the relator asserts that former defendant Healthcare Management Solutions, LLC, prepared and furnished to former defendant KPMG a document summarizing all third party liability accounts. *Id.*[7] The document purportedly showed that, in 2006, the Staten Island facility reserved the amount "from 2005, $2,120,647, increased by 2006's $2,674,822, for a total of $4,795,469 for two years." *Id.* But the relator does not: (1) explain how this document relates to any act Huron purportedly committed; (2) address whether the reserve was made simply because it was known that once a cost report was settled or tentatively settled a lower CCR may be applied to determine whether discrete patient cases resulted in outlier payments; (3) address whether CMS or the fiscal intermediary, through their normal procedures, paid the correct amount of outliers when the cost reports were settled and payments reconciled; or (4) identify any specific outlier claim presented to the government that was inflated because hospital charges were too high in light of hospital costs, or what those charges should have been in light of hospital costs that caused the charges to be "false" in the first instance.

- In ¶ 43, the relator contends that one document, the provider's Statistical and Reimbursement Summary of Payments ("PS&R"), showed that, in 2004, the Staten Island facility received outlier reimbursement of $100,658. *Id.* That number increased in 2005 and 2006 to $3,138,894 and $3,044,714, respectively. *Id.* But the relator does not: (1) explain how Huron purportedly caused this facility to receive inflated outlier payments; (2) address why the amount of outlier payments received was not appropriate in light of higher hospital costs, or identify the increased charges and costs; (3) address whether CMS or the fiscal intermediary, through their normal procedures, paid the correct amount of outliers when the cost reports were

---

[7] Both these defendants – Healthcare Management Solutions, LLC, and KPMG – have been dismissed from the action. *See* Notice of Dismissal Without Prejudice: Order Thereon. (Dkt. 20).

settled and payments reconciled; or (4) identify any specific outlier claim presented to the government that was inflated because hospital charges were too high in light of hospital costs, or what those charges should have been in light of hospital costs that caused the charges to be "false" in the first instance.

- In ¶ 44, the relator contends that a set of documents that compared "the outlier payment the Government was deceived into paying, $2,927,853, with what should have been the correct amount, $342,486" for the Staten Island facility, allegedly showed increases in the percentage of payments related to outlier cases. *Id.* Further, in ¶¶ 45-46, the relator asserts that budget documents show that, as to Mary Immaculate and St. John's hospitals, outlier payments exceeded the amount budgeted and that the excess was reserved. *Id.* But the relator does not: (1) explain how Huron purportedly caused these facilities to receive inflated outlier payments; (2) address why the amount of outliers payments received was not appropriate in light of higher hospital costs, or identify the increased charges and costs; (3) address whether CMS or the fiscal intermediary, through their normal procedures, paid the correct amount of outliers when the cost reports were settled and payments reconciled; or (4) identify any specific outlier claim presented to the government that was inflated because hospital charges were too high in light of hospital costs, or what those charges should have been in light of hospital costs that caused the charges to be "false" in the first instance.

The relator openly acknowledges, on two occasions, that it lacks the specific information it would need to assert an FCA cause of action – namely access to a single false claim. Specifically, the relator admits that it "cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented on behalf St. Vincent's for hundreds of patients, from the period at least from 2005 to 2007. Relator has no

control over or access to the records of such false claims which are within the control and custody of St. Vincent." *Id.* ¶ 60. *See also id.* ¶ 67. In fact, the relator cannot identify even one false claim that Huron allegedly caused to be submitted.

## ARGUMENT

I.   **POINT ONE:  THE RELATOR'S FEDERAL FCA ALLEGATIONS DO NOT SATISFY RULE 9(b)**

Fed. R. Civ. P. 9(b) mandates that "a party must state with particularity the circumstances constituting fraud or mistake." To satisfy the pleading requirements of Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Wood v. Applied Research Assocs.*, 328 F. App'x 744, 747 (2d Cir. 2009), *cert. denied*, 78 U.S.L.W. 3439 (2010) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). Rule 9(b) requires this specificity to provide defendants with fair notice of the alleged misconduct, to protect their reputations, and to prevent the institution of strike suits. As this circuit has explained:

> The purpose of Rule 9(b) is threefold – it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit. Thus, although Rule 9(b) permits knowledge to be averred generally, we have repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent. Essentially, while Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. An ample factual basis must be supplied to support the charges.

*Wood*, 328 F. App'x at 747 (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)) (internal citations omitted). "One of the [further] purposes of Rule 9(b) is to discourage the filing of complaints as a pretext for discovery of unknown wrongs. [A relator's]

contention, that discovery will unearth information tending to prove his contention of fraud, is precisely what Rule 9(b) attempts to discourage." *Wood*, 328 F. App'x at 747 (quoting *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989)) (internal citation and quotation marks omitted); *see also United States ex rel. Polansky v. Pfizer, Inc.*, No. 04-cv-0704, 2009 U.S. Dist. LEXIS 43438, at *30-*31 (E.D.N.Y. May 22, 2009).

Here, the relator's complaint does not come close to satisfying Rule 9(b) for at least two reasons: (1) the relator does not even attempt to identify a single Medicare claim or cost report that contained allegedly "false" charges or costs that resulted in a violation of the FCA, let alone state those facts with specificity as required under Rule 9(b); and (2) the relator does not set forth any facts regarding hospital costs, and the relationship between charges and costs, that could have resulted in the submission of a false outlier claim. Indeed, even assuming a hospital submitted some unspecified false outlier claim because some unspecified hospital charge was disproportionate to some unspecified hospital cost, the relator does not state how defendant Huron could have caused such a claim to be submitted or how Huron could have known that, in light of the 2003 regulatory reform (which substantially limited any possibility of outlier payment manipulation), such an excessive charge would result in Medicare making an inflated outlier payment to any hospital. The relator's complaint, if not dismissed, would undermine the purposes underlying Rule 9(b), which include providing defendants with adequate notice of the allegations against them and furnishing the parties and the court with discernable boundaries to conduct and manage discovery.[8]

---

[8] *See, e.g., United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 198 F.R.D. 560, 564 (N.D. Ga. 2000) ("The particularity requirement of Rule 9(b), if enforced, will not only protect defendants against strike suits, but will result in claims with discernable boundaries and manageable discovery limits"), *aff'd,* 290 F.3d 1301 (11th Cir. 2002); *see also Bly-Magee v.*

### A.    The Relator's Complaint does not Satisfy Rule 9(b) Because Relator does not Identify a Single False Statement or Claim

The relator's complaint fails to state fraud with specificity because the relator does not identify a single false claim or statement. "[A]ctual false and fraudulent claims are the *sine qua non* of a False Claims Act litigation." *Pfizer*, 2009 U.S. Dist. LEXIS 43438, at *13 (citations and internal quotation omitted). Thus, this circuit and multiple other circuits have ruled that where a relator cannot identify a single false claim or statement, the relator cannot satisfy Rule 9(b) as a matter of law. *See Wood*, 328 F. App'x at 750 (affirming dismissal because relators' complaint "do[es] not cite to a single identifiable record or billing submission they claim to be false, or give a single example of when a purportedly false claim was presented for payment by a particular defendant at a specific time") (citation omitted); *see also Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1326 (11th Cir. 2009) (dismissing relators' complaint because relators did "not identify a single physician who wrote a prescription with such knowledge [that an off-label use occurred], does not identify a single pharmacist who filled such a prescription, and does not identify a single state healthcare program that submitted a claim for reimbursement to the federal government. The relators contend that their Complaint 'contains factual allegations which reliably indicate that false claims were submitted to the Government' . . . . We disagree. The Complaint piles inference upon inference to suggest that [defendant's] marketing campaign influenced some unknown third parties to file false claims. We cannot conclude that the Complaint satisfied the particularity requirements of Rule 9(b) by offering 'some indicia of

---

*California*, 236 F.3d 1014, 1018 (9th Cir. 2001) ("Rule 9(b) serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis") (citations and internal quotations omitted).

13

reliability . . . of an actual false claim for payment being made to the Government.'") (citation omitted); *United States ex rel. Lacy v. New Horizons*, No. 08-6248, 2009 WL 3241299, at *3 (10th Cir. Oct. 9, 2009) (rejecting the relator's contention that she satisfied Rule 9(b) because she averred that the defendant submitted a false claim for every patient at each facility it operated, since despite "the fact that [the relator's] allegations concern a fairly specific time period (June 1999 to at least April 2004) and an identified class of patients (all patients in the nine operating homes in Oklahoma), she has alleged no specific details concerning any particular false claim for payment submitted (or, to the extent her claims rest on FCA subsections (a)(2) or (a)(3), planned to be submitted) to the government") (footnote omitted); *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 233 (1st Cir. 2004) (dismissing plaintiff's complaint because although plaintiff contended that defendants wrongfully billed Medicare and the complaint referred to false orders and progress notes, the "complaint never specifies the dates or content of any particular false or fraudulent claim allegedly submitted for reimbursement by Medicare . . . [and] provides no identification numbers or amounts charged in individual claims for specific tests, supplies, or services [or] identify or describe the individuals involved in the improper billing . . . ."); *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) (affirming dismissal of plaintiff's complaint because, among other things, plaintiff failed "to set forth dates as to the various FCA violations . . . ."); *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002) (dismissing complaint because it did not set forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making [it], and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the

fraud.")[9] (internal quotations and citation omitted).  Indeed, here the relator admits that it cannot

identify any specific false claim.  *See* First Am. Cmpl. ¶¶ 60, 67.

---

[9] In countless cases like this, where the plaintiff could not state each fraudulent claim with specificity given the volume of claims, courts have nonetheless required plaintiff to state a few representative claims with specificity to comply with Rule 9(b).  In addition to the above referenced cases, see also, among others: *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006) ("We fully recognize [plaintiff] alleges a systematic practice of [defendants'] submitting and conspiring to submit fraudulent claims over a sixteen-year period.  Clearly, neither this court nor Rule 9(b) requires [plaintiff] to allege specific details of *every* alleged fraudulent claim forming the basis of [his] complaint.  However, to satisfy Rule 9(b)'s particularity requirement and to enable [defendants] to respond specifically to [plaintiff's] allegations, [he] must provide *some* representative examples of their alleged fraudulent conduct, specifying the time, place, and content of their acts and the identity of the actors.  [Plaintiff's] complaint is void of a single, specific instance of fraud, much less any representative examples.  Thus, the district court properly dismissed [his] complaint for failure to comply with Rule 9(b)") (emphasis in the original); *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358-59 (11th Cir. 2006) (dismissing relator's action because his complaint "fails Rule 9(b) for want of sufficient indicia of reliability to support the assertion that the defendants submitted false claims.  As the plaintiff did in *Clausen,* [the plaintiff] has described in detail what he believes is an elaborate scheme for defrauding the government by submitting false claims.  He cites particular patients, dates and corresponding medical records for services that he contends were not eligible for government reimbursement.  Just like the *Clausen* plaintiff, though, [he] fails to provide the next link in the FCA liability chain:  showing that the defendants *actually submitted* reimbursement claims for the services he describes.  Instead, he portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement"); *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013-14 (11th Cir. 2005) (dismissing plaintiff's claim under Rule 9(b) because although the plaintiff "provided the 'who,' 'what,' 'where,' 'when', and 'how' of improper practices . . . he failed to allege the 'who,' 'what,' 'where,' 'when', and 'how' of fraudulent submissions to the government") (citation omitted); *United States ex rel. Barlett v. Tyrone Hosp. Inc.*, 234 F.R.D. 113, 122 (W.D. Pa. 2006) (finding "it fatal to [the] pleading that the Plaintiffs failed to produce even one specific claim by the Defendants that was submitted to the Government as an evidentiary example of the claims submitted in order to inject some precision into the Amended Complaint"); *United States ex rel. Phillips v. Permian Residential Care Ctr.*, 386 F. Supp. 2d 879, 883 (W.D. Tex. 2005) (dismissing action under Rule 9(b) because the relators had not identified: "(1) any specific individual who knowingly presented, or caused to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval; (2) any specific officer or employee of the United States Government who received a false or fraudulent claim for payment or approval from any individual associated with the Defendant; (3) any specific false or fraudulent information contained in any alleged claim for payment or approval; (4) the amount of the claim for payment or approval that was allegedly false or fraudulent; (5) any specific individual who knowingly made, used, or caused to be used any false record or statement in

**B.**   **The Relator's Complaint does not Satisfy Rule 9(b) Because Relator Fails to Identify how the Hospitals' Outlier Claims were False in Light of Their Costs and Lacks Other Indicia of Reliability**

The relator's complaint should be dismissed because the complaint does not set forth any specific facts regarding hospital costs, and the relationship between charges and costs, that would result in any allegedly false claim.  Even in those instances in which the government has asserted FCA liability pursuant to the outlier rules, its theory of liability hinges upon a showing that the hospital's charge increases were not reasonably related to cost increases.  *See* United States Mot. to Dismiss Relators' Outlier Allegations at 4-6, 12-14, *United States ex rel. Meshel v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 689 (W.D. Tex. 2007) (No. EP-02-CA-0525-KC)[10] (Salcido Decl. Ex. C).  Here, the relator sets forth no facts regarding St. Vincent Medical Center hospitals' costs from 2004 to 2007, nor does it explain why, in light of its costs, any charge increases would be improper or unlawful.

Moreover, as a result of the relator's failure to plead fraud with specificity, its complaint lacks any indicia of reliability, which is the standard courts frequently employ to determine compliance with Rule 9(b).  *See, e.g., Hopper,* 588 F.3d at 1325; *Lincare*, 428 F.3d at 1012-13; *Karvelas*, 360 F.3d at 234-35.  This is true for at least four reasons.  ***First***, there is no illegality associated with mere charge increases.  According to the government, only charge increases unrelated to costs are illegal.  *See* Ex. C at 4-6, 12-14.  The relator's complaint contains no allegations about St. Vincent's costs.  Thus, relator's reliance on increases in charges and outlier

---

order to have same paid or approved by the Government; and (6) when any actual improper claims were submitted to the Government"); *United States ex rel. Bailey v. Ector County Hosp.*, 386 F. Supp. 2d 759, 764 (W.D. Tex. 2004) (same).

[10] *See also United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp. at Hamilton*, No.02-5702, 2009 U.S. Dist. LEXIS 38898, at *18 (D.N.J. May 6, 2009) (government stated an outlier claim because charge increases were vastly disproportionate to hospital costs).

payments – without any discussion of hospital costs – says nothing about whether St. Vincent's conduct complied with law. ***Second***, the relator's complaint has no indicia of reliability because the relator fails identify a single actual healthcare claim or show how the scheme it alleges was manifested in an actual submitted claim. Fraudulent schemes are not unlawful under the FCA, only false or fraudulent claims. *See* Argument § I(A). ***Third***, without identifying when the hospitals submitted their cost reports and when those cost reports were finally or tentatively settled, the relator's complaint has no indicia of reliability because there could be no false claim if the fiscal intermediary, upon cost report settlement, applied the correct CCR because any charge increase that was disproportionate to costs would be offset by a lower CCR. ***Fourth***, without cost data and healthcare claims, and in light of CMS' 2003 regulatory revisions, the relator's complaint has no indicia of reliability because it does not explain how Huron, or any other defendant, could embark upon such a scheme when CMS had publicly announced the specific remedies it instituted to prevent precisely such a scheme, as the relator generally outlines, from succeeding.[11] Accordingly, because relator does not identify a single false claim or describe how or why the charges or costs were false, its complaint should be dismissed under Rule 9(b).

---

[11] To assert an FCA conspiracy claim that satisfies Rule 9(b), the relator needs "to provide sufficient facts giving rise to an inference of a meeting of the minds and agreement sufficient to support a claim for conspiracy." *United States ex rel. Godfrey v. KBR, Inc.*, No. 08-1423, 2010 U.S. App. LEXIS 224, at \*15 (4th Cir. Jan. 6, 2010). Nowhere in the relator's complaint is there any indication of any meeting of the minds among defendants to enter into any agreement, what the content of the agreement was, when the agreement was allegedly made, or who participated in the agreement. *See also id.* at \*15-\*16 (affirming dismissal of relator's FCA conspiracy claim where the relator did not allege sufficient facts showing a meeting of the minds or agreement and noting that where the relator could not identify any individual claims with specificity the "relator's conspiracy claim premised on those claims of underlying FCA violations" should also be dismissed).

### C.   The Relator's Generalized Allegations Undermine the Purposes Underlying Rule 9(b)

Finally, the Court's application of Rule 9(b) here would also effectuate the Rule's purpose

of providing notice to the defendants regarding the specific allegations of fraud and of

establishing discernable discovery limits for the case.  As one court recently pointed out in

dismissing an FCA action under Rule 9(b):

> The Plaintiff wants a ticket to the discovery process.  If given such a ticket, the next stage of this litigation is clear.  The Plaintiff will request production of every lab test claim submitted by the Defendant over the last ten years.  At that point, the Defendant may decide to settle the case to avoid the enormous cost of such discovery and the possible disruption of its ongoing business.  On the other hand, the Defendant may choose to resist the discovery. In that case, the Court will be presented with the dilemma of allowing an unlimited fishing expedition or no discovery at all because of the difficulty in fashioning logical and principled limits on what has to be produced.  The particularity requirement of Rule 9(b), if enforced, will not only protect defendants against strike suits, but will result in claims with discernable boundaries and manageable discovery limits.

*Lab. Corp. of Am.*, 198 F.R.D. at 564.

Here, Rule 9(b)'s purposes would be undermined unless the relator links its allegation to

the facts underlying a specific claim, because Huron will not have notice regarding why any

particular claim is allegedly false (*e.g.*, what a "true" charge should have been on the claim form

as opposed to the allegedly "false" charge that appeared on the claim form); relator would be

allowed to proceed with speculative allegations and damage Huron's standing in the community

without supplying any specificity regarding a single claim; and the Court will not have sufficient

information to tailor discovery because there will be no specificity provided regarding which

outlier claims are presumably fraudulent and which are not.

## II.   POINT TWO:  THE RELATOR'S FEDERAL FCA ALLEGATIONS SHOULD BE DISMISSED UNDER RULE 12(b)(6)

To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).  Here, the relator's contention that Huron "caused" false claims to be presented because it allegedly participated in hospital management or allegedly caused the hospitals to fail to repay money owed to the government is insufficient to state an FCA claim and therefore should be dismissed under Rule 12(b)(6).  *See* First Am. Compl. ¶¶ 9(b), 12(b).

Under the FCA, mere knowledge that an alleged false claim is being submitted with nothing more does not state a cause of action for "causing" a false claim to be submitted.  *See United States ex rel. Shaver v. Lucas Western Corp.*, 237 F.3d 932, 933 (8th Cir. 2001) (ruling that the relator did not establish FCA causation when he "did not allege that [the defendant] affirmatively instructed him" to submit his claims but only that the defendant "'knew' [the relator] would submit" such claims to the government) (citations omitted); *United States ex rel. Camillo v. Ancilla Sys. Inc.*, No. 03-CV-0024-DRH, 2005 U.S. Dist. LEXIS 14638, at *10 (S.D. Ill. July 18, 2005) (dismissing action against parent company that allegedly knew that wholly owned subsidiary was submitting false claims because "[u]nder the FCA, mere knowledge of a claim with nothing more does not constitute a violation"); *United States ex rel. Grynberg v. Ernst & Young LLP*, 323 F. Supp. 2d 1152, 1155 (D. Wyo. 2004) ("allegations that [auditor] had direct knowledge of a fraud on the government but did nothing to stop it are not enough to state a claim under the FCA"); *United States ex rel. Piacentile v. Wolk*, No. 93-5773, 1995 U.S. Dist. LEXIS 580, at *10-*11 (E.D. Pa. Jan. 13, 1995) (ruling that defendant, who was an owner and company official, did not violate the FCA when he did not affirmatively misrepresent any fact to the

government, but merely failed to inform the government of false statements made by another and to take action to ensure the practice was discontinued).

Indeed, although the relator does not set forth any specific facts establishing that Huron played any role in establishing the procedures under which alleged false claims were submitted, had it played such a role, there would still be no FCA liability because courts have ruled that the mere establishment of such procedures is insufficient to create liability under the FCA. *See, e.g., Ancilla Health Sys.*, 2005 U.S. Dis. LEXIS 14638, at *12 (relator's allegation that defendant "'set up' the procedures that caused the false claims to be submitted by [a third party] . . . fail as a matter of law" because the "creation of general circumstances leading to the submission of false claims are insufficient to state a FCA violation"); *see also United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, No. 94-7316, 2000 U.S. Dist. LEXIS 12081, at *54 (E.D. Pa. Aug. 24, 2000) ("Thus, although Plaintiff may have alleged that Sun Ship caused some of the circumstances that led to the submission of false claims, the plaintiff has not pleaded with adequate specificity any allegations that Sun Ship caused the submission of false claims").[12]

---

[12] *See also United States v. Safe Env't Corp.*, No. 00-C-3509, 2002 U.S. Dist. LEXIS 8421 (N.D. Ill. May 10, 2002) (the defendant, who was an employee and minority shareholder, was not liable under the FCA when he did no more than leave a message for principal shareholder that an Amtrak representative had informed him that he should include the cost of a consultant on a bid proposal and signed a check for the consultant, as the government did not furnish any evidence that the defendant participated in negotiations that resulted in the fraudulent cost of the consultant being passed on to the government); *United States ex. rel. Kinney v. Hennepin County Med. Ctr.*, No. 97-1680, 2001 U.S. Dist. LEXIS 25475 at *32 (D. Minn. Aug. 22, 2001) (granting summary judgment in favor of defendant that presented improper bills for services to actual false claimant, because the defendant had "no control over the content of the claim" and no "apparent right to review the claim forms being submitted").

### III.   POINT THREE:  THE RELATOR'S NEW YORK STATE FCA CLAIMS SHOULD ALSO BE DISMISSED

Relator's fourth cause of action alleges violations of the N.Y. FCA.  *See* First Am. Compl. ¶¶ 75-81.  This claim fails for three reasons.  *First,* Plaintiff's N.Y. FCA claim must satisfy Rule 9(b)'s pleading standards.  *See, e.g., Alnwick v. European Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 638 (E.D.N.Y. 2003) ("In an action in federal district court, even if state law provides the elements of fraud, claimants must plead the circumstances constituting fraud with particularity under Rule 9(b).") (citing 2 James WM. Moore et. al., Moore's Federal Practice ¶ 9.03[1][e] (3d ed. 2003)); *Marcus v. Frome*, 275 F. Supp. 2d 496, 500 (S.D.N.Y. 2003) (citations omitted).  Plaintiff's claims utterly fail to satisfy the pleading requirement for the reasons set forth in Argument Point One I above.

*Second*, even assuming that the N.Y. FCA applies to the claims in question, the relator's complaint should be dismissed because it fails to state a cause of action under Rule 12(b)(6).  *See, e.g. Burns v. Cook*, 458 F. Supp. 2d 29, 45 (N.D.N.Y. 2006) ("[W]here a federal court exercises diversity or pendent jurisdiction over a state law claim, that court must apply state substantive law and federal procedural law.") (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996)); *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, No. 06 Civ. 3085, 2007 WL 867202, at *4 (S.D.N.Y. Mar. 21, 2007) ("The sufficiency of a complaint is a procedural question that, in federal court, is governed not by New York law but by the Federal Rules of Civil Procedure.").  Like the federal FCA, the N.Y. FCA imposes liability on any person who "knowingly presents, or causes to be presented, to any employee, officer or agent of the state or a local government, a false or fraudulent claim for payment or approval."  N.Y. STATE FIN. LAW § 189(1)(a).  As explained in Argument Point Two above, the relator's allegations fail to show how Huron knowingly caused the submission of false

claims, a requirement present in both the federal and N.Y. FCA. *See, e.g., McGrath v. Toys "R" Us, Inc.*, 3 N.Y.3d 421, 821 N.E.2d 519, 522 788 N.Y.S.2d 281 (2004) ("Where our state and local civil rights statutes are substantively and textually similar to their federal counterparts, our Court has generally interpreted them consistently with federal precedent.").

**Third,** the N.Y. FCA was not enacted until April 1, 2007, after the allegedly false claims were filed. *See* N.Y. STATE FIN. LAW § 187-194, *United States ex rel. Romano v. New York-Presbyterian Hosp.*, 00-civ-8792, 2008 U.S. Dist. LEXIS 17002, at *3-*6 (S.D.N.Y. Mar. 4, 2008).[13] Retroactive application of a statute is decidedly disfavored in the law. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988). "There is a presumption against applying statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment." *New York-Presbyterian Hosp.*, 2008 U.S. Dist. LEXIS at *4, quoting *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 278, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994). The New York FCA "has no express statutory grant of retroactivity." *New York Presbyterian Hosp.*, 2008 U.S. Dist. LEXIS at *4. Allowing this claim to proceed would impose an unexpected liability on Huron because the law that was allegedly violated did not exist at the time relator claims it was violated. *See id.* at *5 ("The proposed amended pleading would impose an unexpected liability on [defendant], because when [relator] brought this action eight years ago, no New York False Claims Act existed."); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.,* 133 F. Supp. 2d 162, 166 (E.D.N.Y. 2001) ("Retroactive application of a

---

[13] Relator alleges misconduct occurring "from approximately 2005-2007." *See* First Am. Compl. ¶¶ 1, 60, 67, 74. It is unclear whether this includes claims up to January 1, 2007, or any claims submitted after January 1, 2007. In any event, to the extent the complaint includes FCA claims submitted to New York prior to April 1, 2007, those claims should be dismissed.

statute is inappropriate when it would deprive a party of 'a substantial right' or 'impose an unexpected liability.'").

## CONCLUSION

For the foregoing reasons, the relator's complaint should be dismissed in its entirety.

Respectfully Submitted,

By: /s/Robert Salcido
Robert Salcido (D.C. Bar No. 447951)
(Admitted *pro hac vice*)
Robert K. Huffman (D.C. Bar No. 219915)
(Admitted *pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue NW
Washington, DC 20036
Telephone: (202) 887-4000
rsalcido@akingump.com
rhuffman@akingump.com

Louis L. Nock (LN-0318)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
lnock@akingump.com

## Certificate of Service

I hereby certify that on this 2nd day of February, 2010, I have electronically filed

Defendant Huron Consulting Group, Inc.'s, Memorandum Of Points And Authorities In Support

Of Motion To Dismiss The Relator's  Federal Claims Under Fed. R. Civ. P. 9(b) And 12(b)(6)

using the CM/ECF system, which will send notification of such filing to the following:

> Prete Bharara
> Brian M. Feldman
> Department of Justice
> Civil Division
> 86  Chambers Street
> Third Floor
> New York NY 10007
>
> Philip R. Michael
> Michael Law Group
> The Chrysler Building
> 405 Lexington Avenue
> Seventh Floor
> New York NY 10174
>
> COUNSEL FOR PLAINTIFFS
>
> Daly D.E. Temchine
> EpsteinBeckerGreen
> 1227 25th Street, NW
> Suite 700
> Washington, DC 20037-1156
>
> COUNSEL FOR DEFENDANT EMPIRE HEALTHCHOICE
> ASSURANCE, INC. (D/B/A EMPIRE MEDICARE SERVICES)

/s/Penney Hughes