```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
UNITED STATES OF AMERICA, THE STATE  :
OF NEW YORK, ex. rel. ASSOCIATES     :
AGAINST OUTLIER FRAUD,               :
                                     :
              Plaintiffs,            :
                                     :
          -v-                        :
                                     :
HURON CONSULTING GROUP, INC.; HURON  :
CONSULTING GROUP, LLC, HURON         :
CONSULTING SERVICES, LLC; and EMPIRE :
HEALTH CHOICE ASSURANCE, INC. d/b/a  :
EMPIRE MEDICARE SERVICES,            :
                                     :
              Defendants.            :
------------------------------------ x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/5/13

09 Civ. 1800 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

In this long-running qui tam action, plaintiff-relator Associates Against Outlier Fraud alleges that defendants Huron Consulting Group, Inc., Huron Consulting Group, LLC, and Huron Consulting Services, LLC (collectively, "Huron"), and defendants Empire Health Choice Assurance, Inc., and Empire Medicare Services (collectively, "Empire") violated the False Claims Act, 31 U.S.C. § 3729 ("FCA") and the analogous New York False Claims Act, N.Y. State Fin. Law § 187 et seq., in connection with the submission of certain Medicare and Medicaid reimbursement forms to the Centers for Medicare and Medicaid Services ("CMS"), a Government agency that oversees the programs.[1]

---

[1] On January 6, 2010, the United States served notice of its decision to decline intervention in this action.

By way of brief procedural background, the Court notes that the relator filed its First Amended Complaint on December 9, 2010. On August 25, 2010, the Court issued a Memorandum Order dismissing with prejudice the state law claim against Empire and dismissing without prejudice the remaining claims in the First Amended Complaint.  See 08/25/10 Memorandum Order at 6-7.  On October 6, 2010, the relator filed a Second Amended Complaint and reasserted all of the claims that the Court previously dismissed without prejudice except for a conspiracy charge. The defendants filed new motions to dismiss on October 19, 2010, and, on December 30, 2010, the Court denied the motions. Relator further amended the Complaint on March 21, 2011, to correct which "Huron" entities it wished to name as defendants. See Third Amended Complaint ("TAC").

After the parties completed discovery, the defendants separately moved for summary judgment on relator's surviving claims. For the reasons set forth below, the Court hereby grants defendants' motions for summary judgment.

The pertinent facts, either undisputed or, where disputed, taken most favorably to relator, are as follows.[2] Under the Medicare payments system, providers are reimbursed for inpatient procedures based on billing categories known as diagnosis-related groups, for which Medicare usually reimburses providers a certain fixed amount.

---

[2] Except where indicated, citations refer to undisputed paragraphs of either Huron's or Empire's Rule 56.1 statement.

These payments are based on a predetermined schedule, and for most claims, providers receive a fixed payment regardless of what the hospital listed as its actual charges for a given service. Empire's Rule 56.1 Statement of Undisputed Facts ("Empire 56.1") ¶ 7.

However, while reimbursement at a fixed rate is the usual outcome of the Medicare reimbursement process, occasionally providers are reimbursed additional add-on payments, id., which include amounts called "outlier payments" in the parlance of the Medicare system. See 42 U.S.C. § 1395ww(d)(5)(A)(ii). Most relevant to this case, these outlier payments can arise in the following circumstances:

When a provider submits its bill to Medicare (usually through an intermediary, as discussed below), even though the reimbursement from Medicare for the procedure is usually predetermined by the procedure's diagnostic-related-group, the provider nevertheless includes its own stated charge for the service. An automated computer system created by CMS takes these submitted charges and calculates its own estimate of the provider's costs using a provider-specific "cost-to-charge ratio." Empire 56.1 ¶ 14. As the name suggests, the cost-to-charge ratio is calculated based on a provider's overall report of its total costs for services and its overall report of its charges. Before 2003, only "settled" cost reports were used for this purpose but after 2003, either "settled" or "tentative" cost reports could be used to calculate a facility's cost-to-charge ratio. Id. ¶¶ 19-20. When the automated payments system determines that a

3

provider's submitted charge, adjusted for cost, is higher than the usually applicable fixed price and loss amounts, the provider will automatically receive an outlier payment. Id. ¶ 14. Thus, outlier payments are made automatically whenever a provider's stated charge, adjusted by the provider's historical cost-to-charge ratio, exceeds the price and loss amounts assumed by Medicare's ordinary diagnosis-related-group model. Id. ¶¶ 11-13.

The cost-to-charge ratio is always a retrospective calculation: it represents the quotient of the hospital's costs during a reported cost period divided by the hospital's charges in effect during the same period. Because the calculation of an outlier payment is based upon a current charge adjusted by a historical cost-to-charge ratio, a program of across-the-board increases in the amounts a provider charges Medicare can immediately increase the "charge" component of the outlier calculation before the provider's retrospective cost-to-charge ratio has a chance to catch up. Thus, when a facility increases its charges across the board, the formula for calculating outlier payments will apply a cost-to-charge ratio that is stale to a charge that is freshly marked up. In short, there will be a time lag between the new increase in charges and the moment "when the increased charges impact the hospital-specific [cost-to-charge ratio] contained in the [processing] system." Id. ¶ 23.[3]

_____

[3] Relator denies this paragraph of Empire's 56.1 statement "as to its truthfulness." Pl.'s Response to Empire's 56.1 ¶ 23. Relator's objection, however, is not to the truthfulness of the

4

A simplified hypothetical may help explain the otherwise opaque logic of the cost-to-charge ratio in Medicare's "outlier" reimbursement system. Suppose in year 1, a provider were, on average, to charge Medicare $1000 for procedure A, which, on average, costs it $500. This would yield a cost-to-charge ratio of 0.5. Suppose further that the next year the provider raised its charges to average $2000 for procedure A while its costs remained constant at an average of $500. Year 2 would yield a cost-to-charge ratio of .25. In both year 1 and year 2, it is possible to come to a judgment about whether a particular instance of procedure A was aberrantly costly -- that is, an "outlier" from the norm -- by multiplying the singular charge for an instance of a procedure by the year's overall cost-to-charge ratio.[4] So, an instance of procedure A for which the provider charged $2000 would yield an estimated cost of $1000 in year 1 (during which the procedure was relatively expensive to perform) but only $500 in year 2 (during which the cost for the procedure was par for the course).

_____

statement that a cost-to-charge ratio may become stale, but rather to Empire's assertion that the lack of immediacy in its updating of St. Vincent's cost-to-charge ratio was "according to CMS direction." Empire 56.1 ¶ 23. See Pl.'s Mem. in Opp'n to Summary Judgment at 24 (conceding that claims made after a "new [cost-to-charge ratio] was operative" are not fraudulent).

[4] The Court emphasizes that for the purpose of this hypothetical it has simplified the complex formula for calculating a hospital's gross charge for a service. See Empire 56.1 ¶ 13; Norwalk Decl. Ex. 1 ¶ 41.

Because this hypothetical assumes an up-to-date calculation of the cost-to-charge ratio, therefore, in a utopian world of efficient administration of medicare reimbursement, a provider's decision to double its charges even though its costs remained constant would not allow it to collect new "outlier payments" from the government because the increase in the average charge would likewise affect the cost-to-charge ratio. But if, more realistically, government cost accounting proceeded at a slower pace, the hypothetical provider who submitted new claims for reimbursement at uniformly higher prices would, in effect, be able to apply the ratio from year 1 to its charges for year 2, so that every $2000 instance of the procedure A could now appear an "outlier." Medicare enables this to occur by paying individual outlier claims as they are submitted, even though cost reports for that year -- and thus the cost-to-charge ratio -- may take up to five months beyond the close of a calendar year to be submitted and several years to be settled. Id. ¶¶ 11, 24-26.

The possibility that outlier payments might be driven more by the staleness of a provider's cost-to-charge ratio than by the provision of genuinely costly services thus creates the short-run problem that Medicare reimbursements will be artificially inflated when a provider raises its charges while its cost-to-charge ratio lags behind. Over the long-run, however, outlier payments that are the result of imputing costs based on an artificially low cost-to-

6

charge ratio rather than the result of genuinely costly treatments represent only temporary windfalls to the provider. This is because in 2002, CMS guidance was amended to contemplate a reconciliation process that would retroactively recoup excessive outlier payments once the applicable cost reports are settled. Id. ¶ 34; 42 C.F.R. § 412.84(i)(4). Pursuant to the 2002 change in outlier reconciliation and additional regulations issued in 2003, when a facility's costs are "finally" (rather than "tentatively") settled, outlier payments can be subject to reconciliation if the historical cost-to-charge ratio applied at the time of the reimbursement was out of step with the actual cost-to-charge ratio the facility experienced during the applicable year. Empire 56.1 ¶ 34; 42 C.F.R. § 412.84(i)(4).

Adding yet more complexity to the outlier cost reimbursement system, and adding another defendant to this action, is the fact that Medicare reimbursements from the government to providers proceed by way of a "fiscal intermediary." Empire 56.1 ¶ 1. These intermediaries act as administrative contractors to CMS, and thus pay claims, process cost reports, and annually audit cost reports of Medicare providers in New York. Id. ¶ 2. To implement outlier reconciliation, CMS instructed fiscal intermediaries to flag providers when their outlier payments exceeded certain absolute or relative thresholds. Id. ¶¶ 34-41. CMS Program Memoranda A-02-122, Change Request 2500 (December 3, 2002) ("CR 2500") and A-03-058, Change Request 2785 (July 3, 2003) ("CR 2785").

7

With these arcana of Medicare reimbursement in mind, it is possible to understand the rest of the factual background to this dispute. Saint Vincent Catholic Medical Centers ("St. Vincent's") was formed in 2000 by the merger of several hospitals in Manhattan and Staten Island. Huron's Rule 56.1 Statement of Undisputed Facts ("Huron 56.1") ¶ 1. Defendant Empire was the fiscal intermediary servicing St. Vincent's during the period of time relevant to this suit. Empire 56.1 ¶¶ 2-3. Facing the prospect of steep losses, St. Vincent's board, in 2003, retained the firm of Speltz & Weis LLC to turn the enterprise around. Huron 56.1 ¶ 3. Soon thereafter, David Speltz and Timothy Weis of that firm became St. Vincent's CEO and CFO respectively. Id. ¶ 4.

Among Speltz and Weis's priorities was the revitalization of the hospitals' revenue cycle: they found that the St. Vincent's culture placed insufficient emphasis on ensuring that all charges for services rendered were entered and placed on a patient's bill. Id. ¶ 11. Moreover, when St. Vincent's did bill for services rendered, the charges were, in most cases, substantially below costs. Id. ¶ 16. In Speltz and Weis's judgment, St. Vincent's could not meet its costs while charging below-market rates and failing to bill for the services it rendered. Id. ¶ 19.

In June 2004, St. Vincent's adopted a ten percent increase in the amounts it charged. Id. ¶ 20. Later that fall, St. Vincent's further increased its pricing in response to the results of an

8

outside analysis of its billing coding practices and its pricing relative to the market. Pursuant to that study, St Vincent's elevated its pricing to the seventy-fifth percentile of the market, reflecting an overall price increase of approximately 33 percent. Id. ¶¶ 23-29.

The 2004 charge increases at St. Vincent's noticeably increased the facility's outlier reimbursements from Medicare, a result "which pleased hospital officials." Id. ¶ 47. Concerned that the outlier reimbursement might be subject to reconciliation, the hospital began to track the amount of its outlier payments potentially subject to reconciliation in a "liability account." Id. ¶ 48. Hospital officials held an internal discussion over whether they were obligated to report the increased outlier reimbursement to Medicare, but concluded that were not obligated to do so since the "outlier" resulted from "appropriate" price increases. Id. ¶ 53.

On May 10, 2005, after the price increases at St. Vincent's had taken full effect, defendant Huron purchased Speltz & Weis LLC. Id. ¶ 55. Two months later, St. Vincent's filed for Chapter 11 bankruptcy protection. Id. ¶ 59.

Throughout the period of its bankruptcy, St. Vincent's continued to receive "outlier" payments based upon a cost-to-charge ratio calculated from cost reports dating to 2003 and earlier -- that is, before the overall charge increase at St. Vincent's. This resulted in "St. Vincent's receipt of outlier payments potentially subject to reconciliation." Id. ¶ 84.

9

In October, 2006, St. Vincent's informed Empire that its cost-to-charge ratio should be adjusted to reflect its open cost reports from 2004 and 2005, which would result in a downward revision of the cost-to-charge ratio. Id. ¶¶ 85, 87. On November 30, 2006, a month after St. Vincent's disclosed its stale cost-to-charge ratios to Empire, St. Vincent's submitted its final cost reports for 2005. Id. ¶ 91.

Empire's cost report review process involves several steps: (1) acceptability review, (2) tentative settlement, (3) desk review, (4) any necessary audit, and (5) final settlement. Empire 56.1 ¶ 26. The different reviews of a cost report that occur before the cost report is finally settled (e.g., tentative settlement, desk review, audit) usually result in a lag time of several years between providers' submission of cost reports and final settlement. Id. ¶ 26; Decl. of Peter Reisman ¶ 9.

Once St. Vincent's entered bankruptcy in 2005, Empire did not issue final settlements of St. Vincent's cost reports unless and until it received approval from CMS to do so. Empire 56.1 ¶¶ 55-67. Empire did not issue tentative or final settlements for St. Vincent's until shortly after the hospitals emerged from bankruptcy in September 2007. Id. ¶¶ 74-75. Empire applied updated cost-to-charge ratios on a prospective basis to St. Vincent's 2007 cost reports. Huron 56.1 ¶¶ 87-88.

10

In addition to its usual process for finalizing cost reports, Empire separately responded to CMS's guidance for outlier reconciliation (i.e., CR 2500 and CR 2785) by identifying hospitals meeting CMS's criteria and sending a list of those hospitals to CMS. Empire 56.1 ¶ 42. In response to Empire's first submission, and similar submissions by all fiscal intermediaries, CMS instructed fiscal intermediaries to continue conducting an analysis of providers' cost report data to determine if a hospital should be flagged for outlier reconciliation and then, if the hospital met the criteria, to notify CMS that the hospital required outlier reconciliation but "not . . . take any further steps with respect to the outlier reconciliation until instructed to do so by CMS." Id. ¶ 43. According to Peter Reisman, a regional administrator for CMS, "[f]rom 2004 until the present, Empire . . . notified CMS of numerous providers that met the criteria for outlier reconciliation, including St. Vincent's for the years 2005 and 2006." Decl. of Peter Reisman ¶ 21.

In June of 2008, Dollyann Yorke, an administrator at St. Vincent's, contacted Empire and disclosed that she was concerned that St. Vincent's may have received excessive outlier payments in 2005 and 2006. Empire 56.1 ¶ 96. On November 6, 2008, Peter Reisman from CMS spoke with St. Vincent's counsel and discussed the issue of its 2005 and 2006 outlier payments. St. Vincent's expressed the concern that its cost-to-charge ratio was not properly adjusted during the

11

period of its bankruptcy. Mr. Reisman advised St. Vincent's counsel that Empire did not yet have the means to calculate outlier overpayments but that St. Vincent's should reserve money to pay CMS back when the overpayments could be calculated. Id. ¶ 102.

In late 2008 when Reisman spoke to St. Vincent's, CMS believed it would, in short order, be able to provide fiscal intermediaries such as Empire with the necessary outlier reconciliation guidance and accounting tools to implement the reconciliation process. However, CMS did not actually issue guidance for conducting outlier reconciliation and release the outlier reconciliation accounting tool until 2011. Id. Now that this guidance and "reconciliation tool" are available to Empire, Empire is currently processing the outlier reconciliations for providers flagged to CMS between 2002 and 2011, including the 2005 and 2006 outlier payments at St. Vincent's. Id. ¶ 106.

Against this factual background, the question now before the Court is whether, pursuant to Federal Rule of Civil Procedure 56(a), the defendants are entitled to a judgment as a matter of law. "The False Claims Act . . ., 31 U.S.C. §§ 3729-3733, prohibits submitting false or fraudulent claims for payment to the United States, § 3729(a), and authorizes qui tam suits, in which private parties bring civil actions in the Government's name, § 3730(b)(1)." Schindler Elevator Corp. v. United States ex rel. Kirk, 131 S.Ct. 1885, 1889 (2011). In order to establish liability a plaintiff must show "that

12

defendants (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." United States ex rel. Mikes v. Straus, 274 F.3d 687, 695 (2d Cir. 2001). The FCA does not require specific intent to defraud, and defines "knowingly" as either: (1) possessing "actual knowledge"; (2) acting in "deliberate ignorance" of the truth or falsity of the information; or (3) acting in "reckless disregard" of the truth or falsity of the information. See 31 U.S.C. § 3729(b)(1).

Courts in this Circuit find claims "false" under the False Claims Act on three principal bases: factually false claims, claims made under color of an expressly false certification of compliance with federal law, and claims made under color of impliedly false certification of the same. Claims are "factually false" when they are based upon "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided," Mikes, 274 F.3d at 697. "Factual falsity" simply means a contractor may not bill for something it does not provide. Liability for false certification of compliance, or "legal" falsity, on the other hand, is more difficult to pin down since even though the FCA is "not designed to reach every kind of fraud practiced on the Government," id. (quoting United States v. McNinch, 356 U.S. 595, 599 (1958)), a claim that is "provided in violation of contract terms, specification, statute, or regulation" is a false claim. Mikes, 274

13

F.3d at 697. The Second Circuit has further elaborated that a false certification may be "express," meaning that the claim itself "falsely certifies compliance," or "implied," meaning that the statute or regulation "expressly states the provider must comply in order to be paid," the provider knows that compliance is required, and the provider submits the noncompliant claim anyway. Id. at 698-700. Finally, it is clear in this Circuit that liability for a "legally false" certification will not lie "when the alleged noncompliance would not have influenced the government's decision to pay." Id.

Here, relator pursues two theories of liability, tailored to each defendant. Against Huron, relator alleges that St. Vincent's executives, for whose conduct Huron is allegedly now liable,[5] knowingly submitted charges that would take advantage of the time lag in updating St. Vincent's cost-to-charge ratio in order to "game the outlier system." TAC ¶ 72. "Charges were unilaterally increased without regard for the CMS rule that [c]harges should only be increased in proportion to increases in [c]osts." Id. ¶ 86. Consequently, relator alleges that Huron caused St. Vincent's to present fraudulent records and statements to Medicare for

---

[5] The relator and Huron dispute whether Huron may be held liable for the actions of Speltz and Weis at St. Vincent's and whether Huron can be held liable because it allegedly held itself out as a manager of St. Vincent's before the bankruptcy court. Because the Court grants summary judgment on unrelated grounds, it need not reach these issues.

14

reimbursement, that Huron falsely certified its compliance with applicable statutes, and that these false and fraudulent acts caused the Government to pay illegal reimbursements to St. Vincent's. Id. ¶¶ 129-35.

Against Empire, relator alleges that "Empire's misconduct picked up where [Huron's] left off," when, acting as fiscal intermediary, Empire authorized payment of Huron's claims "recklessly" and in contravention of its contractual obligations to CMS. TAC ¶¶ 92-102. As relator clarified in its opposition to Empire's summary judgment motion, "[t]he essence of the allegation against Empire is that, as a fiscal intermediary in contract with [the government], it had recklessly disregarded its contractual obligations by ignoring clear and repetitive signs of fraud and/or fraudulent conduct . . . ." Relator's Mem. in Opp'n to Empire's Mot. for Summ. J. at 1.

Neither theory of liability survives summary judgment. A brief recitation of the Court's original reasons for permitting the amended complaint to proceed past the motion-to- dismiss stage suggests why summary judgment is now required. After the Court granted defendants' original motions to dismiss, without prejudice, partly because of relator's failure to plead with particularity, see Memorandum Order of 08/25/10 at 5, relator re-pleaded its FCA claims to include specific allegations that, even if Huron's increase in outlier reimbursements was simply the result of using stale cost-to-

15

charge ratios, such use was still false and fraudulent because

defendants were required, by law or practice, to use updated cost-to-

charge ratios pursuant to the 2003 reforms. Indeed, the amended

complaint alleged that this view of the 2003 reforms was "universally

recognized." TAC ¶ 67. But on the instant motions, relator has been

unable to support this fundamental allegation with either facts or

law.

As to the law, while defendants neglected to adequately brief

the point at the motion to dismiss stage, they now assert that

relator has failed to point to any Medicare rule, regulation, or

manual provision that defines the manner in which hospital charges

must relate to costs. Attempting to respond, relator first points the

Court to what it describes as a CMS "decree" published in the Federal

Register that "promulgate[s]" the "regulation" that "[i]f a

hospital's rate-of-charge increases . . . exceeds the rate of the

hospital's cost increases during that time, the hospital's

cost-to-charge ratio . . . will be too high . . . . Hospitals with

increases in charges that are far above the national average rate-

of-increase, for example, would be likely to have an alternate ratio

assigned." Relator's Mem. in Opp'n to Huron's Mot. for Summ. J. at 3

(quoting Change in Methodology for Determining Payment for

Extraordinarily High-Cost Cases (Cost Outliers), 68 Fed. Reg. 34494,

34494-98 (June 9, 2003)). But the quoted section is not a regulation

16

of any sort, but merely a preambular warning against the dangers of
"overcharging" when a facility's cost-to-charge ratio is outdated.

Next, at oral argument, relator asked the Court to look
instead to "that sort of second part of the regulation, which
provides the relationship that should exist between costs and
charges." Transcript of Oral Argument, July 17, 2012, at 9. While
relator's reference to the "second part of the regulation" was less
than helpful, given that the regulation spans 22 pages, the Court,
having now reviewed the entire regulation in detail, finds that the
regulation establishes, not a fixed relationship between charges and
costs when they are submitted, but rather an outlier reconciliation
process empowering the government to claw back excessive outlier
payments, plus interest, once cost reports are finalized for a
provider. See 42 C.F.R. § 412.84(i)(4), (m).

Relator also seeks to rely on Section 2203 of Medicare's
Provider Reimbursement Manual, which, according to relator,
"establishes that 'for purposes of receiving outlier payments any
charges that are not related to costs are not allowable for use in
apportioning costs under the program.'" Relator's Mem. in Opp'n to
Huron's Mot. for Summ. J. at 4. Yet the requirement that charges
reasonably "relate to" costs does not prohibit Huron's pricing
increases, for, as undisputed sections of Huron's 56.1 statement make
clear, at the time of the charge increases, St. Vincent's prior
charges had been found to be so poorly aligned with costs that they

17

often were below actual costs, necessitating its program of pricing increases that, of necessity, were "related to" actual costs. See Huron 56.1 ¶¶ 6, 16. In the Court's view, section 2203's requirement that charges be "related to" costs specifies nothing whatsoever about the proper rate of change of costs or charges, nor does it go so far as to require "proportionality" in any change.

Relator further argues, without any meaningful citation, that there is a "proportionality rule," "mandated by law" according to which "increasing Charges disproportionately to Costs is fraud." Relator's Mem. in Opp'n to Huron's Mot. for Summ. J. at 4, 24 n. 14. Yet the only law to which the relator directs this Court in support of these assertions is 42 U.S.C. § 1395x(v)(I)(A). That provision defines "reasonable costs" so as to permit (but not require) the use of "charges or a percentage of charges where this method reasonably reflects the costs," Relator's Mem. in Opp'n to Huron's Mot. for Summ. J. at 4, but does not speak in terms of "proportionality" or apply directly to outlier payments.

The Court concludes that not one of these provisions, nor all of them read together, establish a "proportionality" rule for charge adjustment. Nor do any of these provisions establish that submission of charges to Medicare when a facility's cost-to-charge ratio is stale is per se unreasonable and therefore false or fraudulent under the FCA. Moreover, discovery has, if anything, completely disproved the Complaint's allegations that relator's interpretation of these

provisions is "universally recognized" or that it accords with some standardized practice. As for the Complaint's more sensational allegation that St. Vincent's maintained a surreptitious hidden ledger to track its "illicit" profits from outlier payments, discovery has established that St. Vincent's simply tracked its outlier as a potential liability and made the data available both to Empire and its auditor KPMG. Huron 56.1 ¶¶ 48-50.[6]

There is, in sum, no law, rule, regulation, or fact rendering Huron's submission of outlier-producing bills under these circumstances false or fraudulent. See also Boca Raton Comm. Hosp., Inc. v. Tenet Healthcare Corp., 238 F.R.D. 679, 689 (S.D. Fla. 2006) (denying class certification in part because "CMS has never taken a position on what level of overcharging is unlawful or unreasonable."). At worst, Huron's alleged misconduct here -- i.e., raising its charges while benefitting from a stale cost-to-charge ratio -- may have been a bad practice, but it was not forbidden by either regulation or standard practice. Consequently, no reasonable juror could find that the submission of Huron's charges to CMS during 2004, 2005, and other times during which its cost-to-charge ratios were stale, were "false" in terms of the False Claims Act.

---

[6] Relator's objections on grounds of irrelevance, immateriality, and the like to paragraphs 49-50 of Huron's 56.1 regarding Huron's provision of its accounting information to KPMG and Empire are frivolous. Moreover, relator itself concedes in opposition to Huron's motion that "[a]s early as March of 2006, KPMG was informed . . . of large outlier overpayments attributable to significant increases in Charges." Relator's Mem. In Opp'n to Huron's Mot. for Summ. J. at 10.

This conclusion compels the same result for defendant Empire, though relator has also argued that Empire faced additional regulatory requirements. These principally consisted of Empire's alleged duty to CMS to "assure" that Huron followed "new 2003 outlier calculation rules," TAC ¶ 93, and Empire's allegedly enhanced duty to CMS to avoid overpayments to providers when Huron entered bankruptcy. Id. ¶ 94. Furthermore, relator argues that Empire "totally ignored" CMS outlier warnings and that as a fiscal intermediary, it personally submitted false claims by forwarding Huron's bills for payment. Id. ¶¶ 94-95.

The Court has already rejected relator's argument that there were "new 2003 outlier calculation rules" that so clearly countermanded Huron's outlier reimbursements as to make Huron's charges "false or fraudulent." That alone disposes of relator's arguments about Empire, for if there were no false statements by Huron, nothing that Empire did with respect to these statements could render it liable under the False Claims Act.

Relator, however, also argues that "42 C.F.R. 413.64(j)" (sic) independently renders Empire's claims false. Relator's Mem. in Opp'n to Empire's Mot. 17. The Court assumes that relator intended to cite section 413.64(i) of that Chapter, which provides, in pertinent part, that "[i]f on the basis of reliable evidence, the intermediary has a valid basis for believing that . . . [a]  provider is insolvent or bankrupt under an appropriate State or Federal law, any payments

20

to the provider will be adjusted by the intermediary, notwithstanding any other regulation or program instruction regarding the timing or manner of such adjustments, to a level necessary to insure that no overpayment to the provider is made." Payments to Providers, 42 C.F.R. § 413.64(i) (2004). Thus, relator argues, "Empire can be faulted" for "ignoring" post-bankruptcy opportunities to use "multi-faceted mandated operational auditing tools, such as desk reviews [that] were designed to step-by-step pull back the covers on a problematic situation . . . ." Relator's Mem. in Opp'n to Empire's Mot. for Summ. J. at 19. The relator's opposition concludes that "[b]y failing to take this initial mandated desk review step, Empire blocked the government in its follow-up recovery efforts." Id.

In reply, Empire notes that the "overpayments" contemplated by section 413.64(i) are defined elsewhere as the result of "tentative or final settlement notice formally communicated to a provider," not inchoate sums like potential outlier liabilities considered before the reconciliation process has concluded. See Reply Mem. of Law in Supp. of Empire's Mot. for Summ. J. at 6 (citing Medicare Fin. Mgmt. Manual, Ch. 3, § 140.4.2). CMS representative Peter Reisman confirmed Empire's argument, noting that in the absence of any contrary directive from the Department of Justice, CMS instructed Empire not to settle prior cost reports -- even pre-bankruptcy cost reports -- and that "[a]ccording to recent CMS guidance Empire did not have an obligation to adjust the CCR for St.

21

Vincent's while St. Vincent's was in bankruptcy." Decl. of Peter Reisman at 6. Moreover, discovery has directly contradicted the assertion that Empire failed to use any of the audit tools at its disposal to enquire into Huron's outlier reimbursements. As Empire notes in its reply, and relator conceded at oral argument, Empire did complete desk reviews for all of the St. Vincent's entities. See Empire Reply at 8-9; Transcript of Oral Argument, July 17, 2012, at 26-27.

Although relator now pivots to contest the adequacy of Empire's desk reviews, it is clear that relator's shifting theory of recklessness does not cure the independent problem that relator has not shown that Empire submitted a false claim to the government. Because the alleged fraudulent claim at issue in this case is for reimbursement of healthcare services, at best relator's case against Empire proceeds on a theory of "legal" falsity -- i.e., that Empire certified claims (either expressly or impliedly) as complying with applicable statutes and regulations. Moreover, since there is no allegation that Empire expressly certified compliance with "new 2003 outlier calculation rules" (the content of which relator remains unable to clearly elaborate), at best relator proceeds on an "implied certification" theory. But the application of the "implied certification" theory to Empire does not lessen relator's burden.

It is settled law in this Circuit that "implied false certification is appropriately applied . . . when the underlying

22

statute or regulation upon which the plaintiff relies *expressly*
states the provider must comply in order to be paid." Mikes, 274 F.3d
at 700. The applicable regulations are content to describe the
relationship between costs and charges as "related," "reasonable," or
"uniform." The Court has been made aware of no statute or regulation
that *expressly* states that a fiscal intermediary must refuse to
forward any outlier charge for reimbursement that is calculated based
on a stale cost-to-charge ratio.

On the contrary, the applicable regulations and undisputed
statements of fact in this case establish that at most the 2003
regulations and subsequent CMS guidance required fiscal
intermediaries to make preparations for the contemplated outlier
reconciliation process. The reconciliation process, through which
excessive outlier reimbursements, plus interest, are recovered ex
post as part of a "retrospective process," is dependent upon fiscal
intermediaries to flag potential excesses in outlier reimbursement as
those payments are made, but not to suspend payments or to adjust,
sua sponte, cost-to-charge ratios. See Declaration of Peter Reisman
¶¶ 23, 32. Undisputed discovery has revealed that Empire consistently
identified cost reports that contained aberrant outlier payments,
including those for St. Vincent's for 2005 and 2006, and forwarded
that information to CMS pursuant to CMS instruction. It is also
undisputed that apart from the "flagging" process -- with which
Empire complied -- CMS failed to promulgate guidance and provide

23

reconciliation accounting tools to Empire until the end of 2011. Thus there is simply no evidence, bald assertions notwithstanding, that Empire submitted a factually or legally false claim to the government engaging its own liability under the FCA. Consequently, even with the extremely liberal indulgence the Court has given relator's briefing on this motion, the Court concludes that no reasonable jury could find that Empire submitted a false claim under the False Claims Act. The same is true for relator's claims under the New York False Claims Act, which is nearly identical to the FCA in all material respects. See United States ex rel. Pervez v. Beth Israel Med. Ctr., 736 F. Supp. 2d 804, 816 (S.D.N.Y. 2010).

Accordingly, for the foregoing reasons, the Court grants defendants' motions for summary judgment in their entirety and dismisses relator's Complaint with prejudice. The Clerk of the Court is hereby directed to enter final judgment dismissing the Complaint with prejudice and to close documents numbered 113 and 117 on the docket sheet of this case.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
      March 4, 2013

24